# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JMR FARMS, INC., BG CATLIN ENTERPRISES, LLC, GLORY PRODUCE, INC., HOOSIER MELONS, LLC, MELON ACRES, INC., CENTRAL FLORIDA FRUIT SALES, LLC d/b/a SANWAY FARMS, INC., SHORE SWEET GROWERS, LLC, SK ENTERPRISES OF NORTH FLORIDA, INC., WAINWRIGHT BROTHERS FARMS, LLC, WILSON LEE FARMS, BOWLES FARMING COMPANY, INC., BONNE IDEE PRODUCE, LLC, and KEVIN COGGINS d/b/a MEK FARMS, individually and on behalf of all others similarly situated, | Case No. 0:20-cv-00879-PJS-HB |
| Plaintiffs, | |
| *vs.* | |
| C.H. ROBINSON WORLDWIDE, INC.; C.H. ROBINSON COMPANY, INC.; and C.H. ROBINSON COMPANY, | **FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs, JMR Farms, Inc., BG Catlin Enterprises, LLC, Glory Produce, Inc.,

Hoosier Melons, LLC, Melon Acres, Inc., Central Florida Fruit Sales, LLC d/b/a Sanway

Farms, Inc., Shore Sweet Growers, LLC, SK Enterprises of North Florida, Inc.,

Wainwright Brothers Farms, LLC, Wilson Lee Farms, Bowles Farming Company, Inc.,

Bonne Idee Produce, LLC, and Kevin Coggins d/b/a MEK Farms, individually and on

behalf of all others similarly situated, bring this Class Action Complaint against

Defendants, C.H. Robinson Worldwide, Inc., C.H. Robinson Company, Inc., and C.H.

Robinson Company, jointly and severally, and allege and state as follows:

## I.  NATURE OF THE ACTION.

1.      This action arises from Defendants' abuse of their exclusive sales agency obtained from Plaintiffs for the sale of the fresh fruit and vegetables which Plaintiffs grew on their farms.

2.      Defendants' written contracts with Plaintiffs concerned the growing, packing, and sale of fresh produce.

3.      Defendants' compensation under the contracts was commissions from the consignment sales of Plaintiffs' produce.

4.      Defendants' used their special status as Plaintiffs' exclusive agent pursuant to those contracts to obtain additional revenue arising out of or related to the growing, packing, and sale of Plaintiffs' produce.

5.      Defendants reduced the net proceeds payable to Plaintiffs by deducting what was reported by Defendants to be chargeable costs paid or payable by Defendants under the contracts, but the amounts charged included undisclosed profits to Defendants.

6.      Defendants also negotiated rebates with certain farm suppliers resulting in payments to Defendants whenever Plaintiffs purchased goods or services from those suppliers, but Defendants kept the rebates for themselves. Defendants did not disclose to Plaintiffs either the rebate arrangements they had made with suppliers or Defendants' receipt of those rebates.

7.      Defendants' conduct breached duties they owed to Plaintiffs arising under the Perishable Agricultural Commodities Act of 1930 ("PACA"), 7 U.S.C. § 499a, *et seq.*, state law, and the Parties' contracts.

8.     Defendants' conduct with respect to Plaintiffs is consistent with Defendants' patterns, practices, or policies in Defendants' role as the exclusive sales agent for the consignment sale of produce grown by those similarly situated to Plaintiffs.

9.     Plaintiffs' seek for themselves and the members of the Class: an accounting as to transactions related to the sale of produce; actual damages caused by Defendants' unlawful conduct including disgorgement of Defendants' ill-gotten gains, forfeiture of their commissions, any contractually permitted recovery of attorneys' fees and litigation expenses, and punitive damages.

10.    The amount of actual damages owed to each Plaintiff and Class member is readily determined from Defendants' own records created and maintained by Defendants in the ordinary course of their business and which are required under PACA.

## II.  PARTIES.

### A. Plaintiffs.

11.    *JMR Farms, Inc.* is an Indiana limited liability company with its principal offices in Vincennes, Indiana.

12.    *BG Catlin Enterprises, LLC* is a Maryland limited liability company with its principal office in Sharptown, Maryland and is a citizen of the State of Maryland.

13.    *Glory Produce, Inc.* is a Florida corporation with its principal office in Bell, Florida.

14.    *Hoosier Melons, LLC* is an Indiana limited liability company with its principal office in Oaktown, Indiana and is a citizen of the State of Indiana.

15.    *Melon Acres, Inc.* is an Indiana corporation with its principal office in Oaktown, Indiana and is a citizen of the State of Indiana.

16.    *Central Florida Fruit Sales, LLC d/b/a Sanway Farms, Inc.* is a Florida limited liability company with principal offices in Lithia, Florida, reporting as its member, Wayne Moss, who is a resident and citizen of the State of Florida.

17.    *Shore Sweet Growers, LLC* is a Maryland limited liability company with its principal office in Hebron, Maryland and is a citizen of the State of Maryland.

18.    *SK Enterprises of North Florida, Inc.* is a Florida corporation with its principal offices located in Quincy, Florida and a citizen of the State of Florida.

19.    *Wainwright Brothers Farms, LLC* is a Florida limited liability company with principal offices in Live Oak, Florida, and its members, Jacob B. Wainwright and Donald Wainwright, are all residents and citizens of the State of Florida.

20.    *Wilson Lee Farms* is a Maryland limited liability company with its principal office in Hebron, Maryland and is a citizen of the State of Maryland.

21.    *Bowles Farming Company, Inc.* is a California corporation with its principal offices located in Los Banos, California and is a citizen of the State of California.

22.    *Bonne Idee Produce, LLC* is a Louisiana limited liability company with principal offices in Bonita, Louisiana and is a citizen of the State of Louisiana.

23.    *Kevin Coggins d/b/a MEK Farms* is a Georgia sole proprietorship with his principal offices in Lake Park, Georgia, and he is a resident and citizen of the State of Georgia.

### B. Defendants.

24.     *C.H. Robinson Worldwide, Inc.* ("CHRW") is a publicly traded Delaware corporation with its principal place of business in Eden Prairie, Minnesota.

25.     CHRW maintains its principal place of business in Eden Prairie, Minnesota.

26.     CHRW is a publicly traded company listed on the NASDAQ Stock Market under ticker symbol CHRW.

27.     *C.H. Robinson Company, Inc.* ("CHRI") is a Minnesota corporation and, on information and belief, is a wholly owned subsidiary of CHRW.

28.     CHRI maintains its principal place of business in Eden Prairie, Minnesota.

29.     CHRI maintains its principal place of business in the same office as CHRW.

30.     *C.H. Robinson Company* ("CHRC") is a Delaware corporation and, on information and belief, is a wholly owned subsidiary of CHRW.

31.     CHRC maintains its principal place of business in Eden Prairie, Minnesota.

32.     CHRC maintains its principal place of business in the same office as CHRW and CHRI.

### III.  JURISDICTION AND VENUE.

33.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 with respect to Plaintiffs' claims arising under federal law and supplemental jurisdiction under 28 U.S.C. § 1367 with respect to all other claims, including claims arising under state law, because those claims arise from the same conduct which gives rise to the federal law claims.

34.     Venue is proper in this district under 28 U.S.C. § 1391 due to the contractual venue provision contained in Defendants' contracts with each Plaintiff and because each Defendant resides within this jurisdiction.

### IV.   BACKGROUND ON PACA.

35.     Congress enacted the PACA on June 10, 1930.

36.     Among other things, PACA applies to the conduct of a commission merchant, dealer, and broker regarding any transaction involving any perishable agricultural commodity.

37.     The fresh fruits and vegetables which are the subject of the Parties' contracts are perishable agricultural commodities and, depending on the terms of each sale negotiated by Defendants as Plaintiffs' exclusive sales agent, Defendants were a commission broker, a dealer, and/or a broker.

38.     The PACA delegates decision-making and rulemaking authority to the Secretary of Agriculture.

39.     Pursuant to the Code of Federal Regulations, Title 7, Subtitle B, Chapter 1, matters falling with the scope of the PACA are assigned to the Agricultural Marketing Services within the United States Department of Agriculture.

40.     *Honesty.* Under PACA, 7 U.S.C. § 499b(4), it is unlawful for a commission merchant, dealer, or broker:

> to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is

received in interstate or foreign commerce by such commission merchant, or

bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer, or

the purchase or sale of which in such commerce is negotiated by such broker;

or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had;

or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction;

or to fail to maintain the trust as required under section 499e(c) of this title.

41.    Under the PACA Regulations, 7 C.F.R. 46.28 (emphasis added):

The function of a broker is to facilitate *good faith* negotiations between parties which lead to valid and binding contracts. […] A broker who agrees to collect funds from the buyer for his principal shall render an itemized accounting to the principal promptly on receipt of payment showing the true gross selling price, all brokerage fees deducted and all expenses including auction charges, incurred in connection with the sale of the shipment. The failure to account truly and correctly and make full payment promptly is a violation of the Act.

42.    The PACA Regulations, 7 C.F.R. 46.2(hh), define good faith:

Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. The principle of good faith requires that a party to a transaction disclose in writing the existence of any collateral fees and expenses to all other parties to the transaction where the collateral fees and expenses affect a material term of the agreement.

43.     *Private Right of Action.* Under PACA, 7 U.S.C. § 499e(a), a commission merchant, dealer, or broker who violates § 499(b) "shall be liable to the person or persons injured thereby for the full amount of damages . . . sustained in consequence of such violation." Such liability may be enforced at injured party's option either in a proceeding brought before the Secretary of Agriculture or in an action commenced in any court of competent jurisdiction. *Id*. at § 499e(b).

44.     *Preservation of Records.* Under PACA, 7 U.S.C. § 499i, "Every commission merchant, dealer, and broker shall keep such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his business, including the true ownership of such business by stockholding or otherwise."

45.     *Cumulative Remedies.* Relief under the PACA "shall not in any way abridge or alter the remedies now existing at common law or by statute, and the provisions of this chapter are in addition to such remedies." *Id.*

## V.  ALLEGATIONS OF FACT.

### A. Background and Relationship Among the Defendants.

46.     On information and belief, Defendants' predecessor began a North Dakota business in 1905 as a produce dealer sourcing services for buying, selling, and marketing of fresh fruits, vegetables, and other perishable items.

47.     On information and belief, that original business developed over the next century into a nationwide produce distribution business currently operating under the Robinson Fresh® trade name while expanding into the business of providing freight logistics services which now dwarfs the Robinson Fresh business.

48.     According to CHRW's SEC filings, by the end of 2018, the Robinson Fresh® business represented approximately 4% of CHRW's total net revenues.

49.     At all times relevant to this Complaint, Defendants' Robinson Fresh business included the sale on consignment and delivery of wholesale quantities of fresh fruits and vegetables nationwide as exclusive sales agents for produce growers such as Plaintiffs and the Class they seek to represent.

50.     On information and belief based on U.S. Department of Agriculture's online search of PACA licenses [https://apps.mrp.usda.gov/public_search (accessed March 25, 2020)], CHRW never held a PACA licensed but repeatedly represented it had a PACA license.

51.     CHRW's representations to the various courts of the United States that it held a PACA license include:

51.01.     Document 1 filed by CHRW on September 8, 2015 in *C.H. Robinson Worldwide, Inc. d/b/a Robinson Fresh vs. Global Fresh, Inc., et al.*, Case 2:15-cv-07082 (C.D.Ca.) in which, at ¶3, CHRW alleged that it "is engaged in the business of selling wholesale quantities of fresh fruits and vegetables in interstate commerce" and "maintains PACA license number 19701419."

51.02.     Document 91 filed by CHRW on December 29, 2015 in *Evergreen Farms & Produce, LLC, et al. v. ABL Farms, Inc., et al.*, Case 1:15-cv-03171 (N.D.Ga.) which is a declaration made pursuant to 28 U.S.C. § 1736 by Mark Petersen as General Manager of "the CPDS division of C.H.

Robinson Worldwide, Inc." and, at ¶2, states under penalty of perjury that CHRW "is licensed by the USDA-PACA, and currently holds valid PACA license number 19701419." The declaration attached several documents including, at page 11 of 46, an invoice which, at the top of the page, appears to be from CHRW and "Subsidiaries" but, at the bottom of the page, provides the name, address, telephone number, and Tax ID number for CHRC.

51.03.    Document 1 filed by CHRW on November 20, 2017 in *C.H. Robinson Worldwide, Inc. v. Carl J. Denholtz, et al.*, Case 2:17-cv-00641 (M.D.Fla.) in which, at ¶3, CHRW alleged that it "is engaged in the business of selling perishable agricultural commodities ('Produce') in interstate commerce" and "maintains PACA license number 19701419."

51.04.    Document 18 filed by CHRW on February 8, 2019 in *L & M Companies, et al. v. Unique Food Company, Inc. et al.* Case 5:19-cv-00027 (E.D.N.C.) in which, at ¶3, CHRW alleged "is engaged in the business of selling wholesale quantities of fresh produce in interstate commerce, and is licensed by the USDA-PACA Division, License Number 19701419."

51.05.    Document 1 filed by CHRW on April 17, 2019 in *C.H. Robinson Worldwide, Inc., d/b/a C.H. Robinson Company d/b/a Robinson Fresh vs. Phillips Produce LLC, et al.*, Case 8:19-cv-00916 (M.D.Fla.) in which, at ¶3, CHRW alleged it "is engaged in the business of selling wholesale quantities of fresh fruits and vegetables nationwide" and holds "federal

produce license number 20001042 from the U.S. Department of
Agriculture/PACA Branch."

51.06.    Document 1 filed by CHRW on July 1, 2019 in *C.H. Robinson
Worldwide, Inc., d/b/a C.H. Robinson Company d/b/a Robinson Fresh vs.
Centex Produce, Inc., et al.*, Case 1:19-cv-00672 (W.D.Tex) in which, at
¶3, CHRW alleged it "is engaged in the business of selling wholesale
quantities of fresh fruits and vegetables nationwide" and holds "federal
produce license number 20001042 from the U.S. Department of
Agriculture/PACA Branch."

51.07.    Document 1 filed by CHRW on July 23, 2019 in *C.H. Robinson
Worldwide, Inc. vs. Osman Produce, LLC, et al.*, Case 4:19-cv-00372
(D.Ariz.) in which, at ¶3, CHRW alleged it "is engaged in the business of
selling wholesale quantities of fresh fruits and vegetables nationwide" and
holds "federal produce license number 20001042 from the U.S. Department
of Agriculture/PACA Branch."

51.08.    Document 19 filed by CHRW in *C.H. Robinson Worldwide, Inc., et
al. v. P.K. Produce, Inc., et al.*, Case 1:18-cv-02849 (N.D.Ohio) in which,
at ¶3, CHRW alleged it is "engaged in the business of selling wholesale
quantities of fresh fruit and vegetables nationwide through interstate
commerce" and holds "federal produce license number 19701419 from the
U.S. Department of Agriculture/PACA Branch."

51.09.     Document 1 filed by CHRW on September 23, 2019 in *C.H. Robinson Worldwide, Inc., d/b/a C.H. Robinson Company d/b/a Robinson Fresh vs. CKF Produce Corp., et al.*, Case 1:19-cv-05403 (E.D.N.Y.) in which, at ¶3, CHRW alleged it "is engaged in the business of selling wholesale quantities of fresh fruits and vegetables nationwide" and holds "federal produce license number 20001042 from the U.S. Department of Agriculture/PACA Branch."

51.10.     Document 71 filed by CHRW in *Eagle Fruit Traders, LLC v. Ultra Fresh, LLC, et al.*, Case 2:18-cv-14541 (D.N.J.) in which, at ¶3, CHRW alleged it "is engaged in the business of selling wholesale quantities of fresh fruits and vegetables nationwide" and holds "federal produce license number 20001042 from the U.S. Department of Agriculture/PACA Branch."

51.11.     Document 1 filed by CHRW in *C.H. Robinson Worldwide, Inc., d/b/a C.H. Robinson Company, Inc. d/b/a C.H. Robinson Company d/b/a Robinson Fresh vs. Arizona Lemons LLC, et al.*, Case 2:20-cv-00426 (D.Ariz.) in which, at ¶4, CHRW alleged it "is engaged in the business of selling wholesale quantities of fresh fruits and vegetables nationwide" and holds "federal produce license number 20001042 from the U.S. Department of Agriculture/PACA Branch."

52.     According to the U.S. Department of Agriculture's online search of PACA licenses [https://apps.mrp.usda.gov/public_search (accessed March 25, 2020)] of License

Number 19701419 (accessed on March 25, 2020) the licensee is CHRC, the license is currently terminated, and associated trade names are "C H ROBINSON WORLDWIDE INC" and "ROBINSON FRESH."

53.     On information and belief, "C H ROBINSON WORLDWIDE INC" is the legal name of CHRW and is not a trade name, alternate name, fictitious name, assumed name, or other name which CHRC is authorized to use by the State of Delaware (where CHRC is incorporated) or by any other State in which CHRC transacts business.

54.     On information and belief, "ROBINSON FRESH" is a registered trade name owned by CHRW and is not a trade name, alternate name, fictitious name, assumed name, or other name which CHRC is authorized to use by the State of Delaware (where CHRC is incorporated) or by any other State in which CHRC transacts business.

55.     According to the U.S. Department of Agriculture's online search of PACA licenses [https://apps.mrp.usda.gov/public_search, of License Number 2001042 (accessed on March 25, 2020)] the licensee is CHRI, the license is active, and associated trade names are "C H ROBINSON COMPANY", "ROBINSON FRESH", and "C H ROBINSON WORLDWIDE INC".

56.     On information and belief, "C H ROBINSON WORLDWIDE INC" is the legal name of CHRW and is not a trade name, alternate name, fictitious name, assumed name, or other name which CHRI is authorized to use by the State of Minnesota (where CHRI is incorporated) or by any other State in which CHRI transacts business.

57.     On information and belief, "C H ROBINSON COMPANY" is the legal name of CHRC and is not a trade name, alternate name, fictitious name, assumed name,

or other name which CHRI is authorized to use by the State of Minnesota (where CHRI is incorporated) or by any other State in which CHRI transacts business.

58.     On information and belief, "ROBINSON FRESH" is a registered trade name owned by CHRW and is not a trade name, alternate name, fictitious name, assumed name, or other name which CHRI is authorized to use by the State of Minnesota (where CHRI is incorporated) or by any other State in which CHRI transacts business.

59.     On information and belief, CHRC and CHRI entered into a written agreement dated January 1, 2009 in which CHRC permitted CHRI to use CHRC's "trade name" but that agreement does not state CHRC's trade name.

60.     According to the Office of the Minnesota Secretary of State's online search of business names [https://mblsportal.sos.state.mn.us/Business/Search (accessed March 25, 2020)], for "C.H. Robinson Company, Inc." did not show that CHRI ever filed any assumed name certificates pursuant to Minn. Stat. §333.01 which prohibits the use of any name other than CHRI's "true name" (*i.e.¸* the name on its certificate of incorporation) or the name on a filed assumed name certificate.

61.     According to the Office of the Minnesota Secretary of State's online search of business names, https://mblsportal.sos.state.mn.us/Business/Search (accessed March 25, 2020), for "C.H. Robinson Worldwide, Inc." reflected that CHRW is registered in Minnesota as a foreign corporation but it did not show that CHRW ever filed any assumed name certificates pursuant to Minn. Stat. §333.01 which prohibits the use of any name other than CHRI's "true name" (*i.e.¸* the name on its certificate of incorporation) or the name on an assumed name certificate.

62.     According to the Office of the Minnesota Secretary of State's online search of business names, https://mblsportal.sos.state.mn.us/Business/Search (accessed March 25, 2020), for "C.H. Robinson Company" reflected no domestic or foreign business entity by that name.

63.     To the extent any natural person works for CHRI or CHRC, such person is, on information and belief, an employee of and paid by CHRW.

64.     In 2014, CHRW created and, at all times relevant, Defendants have used the brand name Robinson Fresh® to refer to Defendants produce distribution business which includes the buying, selling, and marketing of fresh fruits, vegetables, and other perishable items involving growers, grocery retailers, restaurants, foodservice distributors, and produce wholesalers along with the sourcing of providers for the buying, selling, and marketing of such items.

65.     Defendants do not use the Robinson Fresh name to refer to their transportation and logistics business.

66.     Robinson Fresh® is a trademark registered to CHRW in the U.S. Patent and Trademark Office.

67.     Robinson Fresh is a trade name used by all Defendants.

68.     By referring to their business as Robinson Fresh, by representing to federal district courts that CHRW is doing business as CHRC, CHRI, and Robinson Fresh, by representing to the U.S. Department of Agriculture that CHRW and Robinson Fresh as trade names for CHRC and CHRI (notwithstanding Defendants' failure to file assumed named certificates), and by the fact that CHRC and CHRI are wholly-owned subsidiaries

of CHRW, Defendants have collectively engaged in a joint enterprise under the Robinson Fresh moniker as either an unincorporated association or *de facto* partnership. These facts, together with the manner in which Defendants identified themselves in the written contracts with Plaintiffs which Defendants drafted, render all three Defendants jointly and severally liable on Plaintiffs' claims and the claims of the Class which Plaintiffs seek to represent.

### B. The Parties' Agreements.

69.    Each Plaintiff, as well as each member of the Class, entered into one or more written contracts ("Agreements") drafted by Defendants.

70.    Each Agreement identified a Plaintiff or a member of the Class to be referred to throughout the Agreement as either the "Grower" or the "Grower/Supplier." (For convenience, this Complaint uses the term "Grower" to mean the "Grower" or the "Grower/Supplier" as identified in an Agreement.)

71.    Defendants drafted each Agreement and identified themselves in several ways further reflecting Defendants' collective conduct concerning the Agreements, including:

> (i)    "C.H. Robinson Company" and referred to throughout the Agreement as "C.H. Robinson";
>
> (ii)   "C.H. Robinson Company, dba Robinson Fresh" to be referred to throughout the Agreement as "Robinson Fresh";

(iii)   "C.H. Robinson Company, […], on behalf of itself and its licensed

affiliates, dba Robinson Fresh" to be referred to throughout the

Agreement as "Robinson Fresh"; *or*

(iv)   "C.H. Robinson Company, Inc. on behalf of its operating

subsidiaries […] doing business as Robinson Fresh" to be referred to

throughout the Agreement as "Robinson Fresh".

72.   Some, if not all, Agreements also refer to "Robinson Fresh Worldwide, Inc.

subsidiary entities, including but not limited to Robinson Fresh Company." On

information and belief, there is no corporation formed as "Robinson Fresh Worldwide,

Inc." under the laws of any of the United States.

73.   The Agreements typically included a requirement that a copy of all notices

given by the Grower must be sent to CHRW.

74.   The Agreements deemed CHRW's "subsidiary entities" to be "Affiliated

Companies."

75.   At all times relevant to the transactions alleged in this Complaint, CHRW

assumed all liabilities and rights of CHRC in the Agreements.

76.   At all times relevant to the transactions alleged in this Complaint, CHRW

assumed all contractual liabilities and rights of CHRI in the Agreements.

*C. Common Terms in the Agreements.*

77.   Although each Agreement contained some unique terms, those unique

terms are not material to each Plaintiff's individual claims or to each Class member's

claims as alleged in this Complaint. Instead, each Agreement contained the same or substantially the same terms material to those individual and class claims.

78.     Under the Agreements, each Grower—including each Plaintiff and Class member—agreed to grow and harvest specified agricultural produce defined in the Agreements as the "Products" and Defendants received the exclusive right to market and sell the Products on consignment.

79.     Among other terms, each Agreement provided:

79.01.     In their "endeavor to identify a viable market for PRODUCTS," Defendants "shall market such PRODUCTS on a consignment basis."

79.02.     Defendants agree to "endeavor to obtain the best prices for the kind and quality of the PRODUCTS produced by GROWER." *Id.*

79.03.     Defendants had "full control of the times when, the places where, the parties to whom, the methods and prices for which the Products are sold, and the authority to sell to customers on an FOB, Delivered, Re-consignment, Open, or Price-After-Sale" basis. *Id*.

(A)     Under 7 C.F.R. 46.43(i), "F.O.B." means that

the produce quoted or sold is to be placed free on board the boat, car, or other agency of the through land transportation at shipping point, in suitable shipping condition (see definitions of "suitable shipping condition," paragraphs (j) and (k) of this section), and that the buyer assumes all risk of damage and delay in transit not caused by the seller irrespective of how the shipment is billed. The buyer shall have the right of inspection at destination before the goods are paid for to determine if the produce shipped complied with the terms

of the contract at time of shipment, subject to the provisions covering suitable shipping condition.

(B)     Under 7 C.F.R. 46.43(i), "Delivered" means that

the produce is to be delivered by the seller on board car, or truck or on dock if delivered by boat, at the market in which the buyer is located, or at such other market as is agreed upon, free of any and all charges for transportation or protective service. The seller assumes all risks of loss and damage in transit not caused by the buyer For example, a sale of "U.S. No. 1 potatoes delivered Chicago" means that the potatoes, when tendered for delivery at Chicago, shall meet all the requirements of the U.S. No. 1 grade as to quality and condition.

79.04.     "GROWER will retain title to and all quality risks associated with all

PRODUCTS until delivery to and acceptance by [Defendants'] customer."

79.05.     Defendants' compensation for their sales agent services was a

percentage "of FOB price gross sales return."

79.06.     Defendants agreed to collect the proceeds from each sale out of

which Defendants would pay themselves their Commission Fee, deduct

specified costs, and remit the net proceeds to Plaintiffs and Defendants

agreed to report to Plaintiffs the true sales price for Plaintiffs' Products.

79.07.     In a dispute, the prevailing party may recovery reasonable attorney's

fees.

79.08.     "This Agreement is governed by the laws of the State of Minnesota."

80.     Defendants' customers—that is, the buyers or potential buyers of a

Grower's Products—included grocery retailers, restaurants, foodservice distributors, and

produce wholesalers. (For convenience, this Complaint uses the term "Customer" to mean the buyer or potential buyer of a Grower's Products.)

81.    The sale of a Grower's Products necessarily involves the transportation of the Products from the Grower to the Customer's location.

82.    Most Customers include transportation arrangements an integral and inseparable part of the sales transaction. For those Customers, there would be no purchase of the Products without the inclusion of acceptable arrangements for the delivery of the Products to the Customer's location.

83.    In a Delivered sale and an F.O.B. sale, the Customer pays for both the Products and the transportation, but they are reflected differently.

84.    In an F.O.B. sale, the Customer agrees to the transaction by agreeing to one amount as the price for the Products and agreeing to a separate amount as the price for transportation.

85.    In a Delivered sale, the Customer agrees to one price which includes both the Products and delivery to the Customer's location.

86.    In a Delivered sale, Defendants must calculate "FOB price gross sales return" by adjusting for the transportation carrier expense but, in an F.O.B. sale where the transportation carrier expense is disclosed separately, no adjustment is necessary.

87.    Thus, in both a Delivered sale and an F.O.B. sale, there is a zero-sum tension between the F.O.B. price and the transportation expense. The difference between the two is that, in a Delivered sale, the tension is not expressed and is an internal calculation while, in an F.O.B. sale, the separate amounts are expressed terms. As a

result, as the transportation expense increases, the amount available to pay for the Products deceases.

88.    It is in the Grower's interest for transportation expenses to be kept as low as possible so as to permit a higher price for the Products.

89.    When negotiating sales with Customers, Defendants' interests must be the same as the Growers' interests *unless* Defendants are secretly profiting from the amount they report as the transportation expense by adding an amount on top of the actual transportation carrier charges—which is called "freight topping."

90.    By engaging in freight topping, Defendants' interests are in conflict with the Grower's interests and Defendants cannot be obtaining the "best prices" for the Products because the amount Defendants add to the carrier charges could be added to the F.O.B. price without the Customer paying any more for the Products to be delivered to the Customer's location.

### D. Determining Defendants' Commission and Plaintiffs' Net Proceeds from Each Sale.

91.    The Agreements define "Commission Fee" as Defendants' compensation which is calculated as a percentage of "FOB price gross sales return."

92.    Under the Agreements, Defendants are obligated to collect all monies due from the Customer and to remit to the Grower the balance resulting from "the final FOB sales price" after deducting Defendants' Commission Fee, any funds Defendants may have advanced, and "other charges" including, but not limited to, "inspection" and "claims" as allowed in the Agreement.

### E. Defendants' Standards of Conduct.

93.    Defendants have a standard of conduct for its suppliers, including produce

suppliers, such as Plaintiffs. The standard, known as the Robinson Fresh® Global

Supplier Code of Conduct, can be found at:

> https://www.robinsonfresh.com/en-US/-
> /media/RobinsonFresh/grower%20supplier%20docume
> nts/English/Robinson%20Fresh%20Global%20Supplier
> %20Code%20of%20Conduct%20V1117.pdf

[accessed March 3, 2020.]

94.    The Robinson Fresh® Global Supplier Code of Conduct, at ¶12, provides:

> Robinson Fresh® Growers/Suppliers must maintain
> accurate financial books and business records in
> accordance with all applicable legal and regulatory
> requirements and accepted accounting practices.

[Emphasis in original.]

95.    CHRW's Corporate Secretary and Chief Legal Officer, Benjamin

Campbell, published an Employee Code of Ethics on behalf of CHRW and its

subsidiaries such CHRC and CHRI, which can be found at:

> https://investor.chrobinson.com/Governance/Governanc
> e-Documents/default.aspx

[accessed March 3, 2020.]

96.    The English version of Mr. Campbell's Code of Ethics can be found at:

> https://s21.q4cdn.com/950981335/files/doc_downloads/
> codeofethics/2019/Code-of-Ethics-2019-English-
> External.pdf

[accessed March 3, 2020.]

97.    In Mr. Campbell's opening Message to the Code of Ethics, he states:

> To be successful as an organization we expect everyone from the top down to adhere to the principles in the Corporate Compliance Program to gain and keep the confidence and support of customer, regulatory agencies, the public and our employees.
>
> [* * *]
>
> Thank you in advance for your continued commitment to the highest standards of business ethics and for keeping the passion for success alive at C.H. Robinson.

98.    The Employee Code of Ethics, under a section titled *Accurate Books and Records Policy*, includes these statements:

> Accurate and reliable corporate financial records shall be maintained at all times. All funds and other assets and all transactions for C.H. Robinson must be reflected in full detail and promptly recorded in the appropriate C.H. Robinson books. Accepted accounting principles must be used for all recording.
>
> C.H. Robinson financial records must reflect an accurate and verifiable record of all transactions. Information that you record and submit to another party, whether that party is inside or outside C.H. Robinson, must be accurate, timely, and complete. You must not use any report or record to mislead those who receive them or to conceal anything that is improper.
>
> [* * *]
>
> For purposes of this policy, financial records include all information pertaining to financial transactions which are executed on C.H. Robinson's behalf, including the proper recording of all transactions, records received and kept in C.H. Robinson's files related to financial transactions and all information recorded in the accounting records and financial statements of C.H. Robinson.
>
> Some examples are:
>
> •   Time reports

- Employee expense account records

- Invoices received by C.H. Robinson

- Invoices issued by C.H. Robinson

- Recordings in the general ledger

- Accounting journal entries

- Contracts

- E-mails relating to transactions

- Transactions include all payments of money, transfers of property, and furnishing of services.

All records and information must truthfully and in reasonable detail reflect the substance of the transaction. There is no materiality standard. All transactions must be recorded correctly regardless of amount. Examples of violations include:

- Records that fail to record improper transactions;

- Records that are falsified to disguise aspects of improper transactions that were otherwise recorded correctly;

- Records that correctly set forth the quantitative aspects of the transaction but fail to record the qualitative aspects that would have revealed their illegality or impropriety.

### F. Defendants Maintain Two Set of Books.

99.     Defendants maintain sales and expense records for its Robinson Fresh

business within a commonly known produce accounting software known as "Famous."

100.    Using Famous, Defendants generated consignment grower accountings and

provided those accounting reports to Plaintiffs.

101.   The Famous system is readily auditable by the Secretary of Agriculture as is required under the PACA.

102.   Defendants maintain sales and expense records for its freight logistics business (*i.e.*, its non-Robinson Fresh business) using a separate accounting software system known as Navisphere and formerly known as Compass. (For convenience, this Complaint uses "Navisphere" to refer to Navisphere and Compass.)

103.   Defendants' detailed information regarding shipping Plaintiffs' Products including a breakdown as to all components of the shipping charges is contained in Navisphere but that information was not provided to Plaintiffs by Defendants in the Famous-generated reports or otherwise.

104.   Defendants did not disclose to the Plaintiffs that accurate, more-detailed records containing information about freight costs and revenues arising out of the sale of Plaintiffs' Products were maintained in Navisphere and not in Famous.

105.   The undisclosed records in Navisphere reflect some of Defendants' self-dealing upon which Plaintiffs assert their claims.

### G. Defendants' Double Standard.

106.   Despite Defendants' Supplier Code of Conduct and employee Code of Ethics requiring "[i]nformation that [Defendants' employees] record and submit to another party, whether that party is inside or outside C.H. Robinson, must be accurate, timely, and complete," the consignment accountings provided to the Plaintiffs and Class members were neither accurate nor complete.

107.   Despite the Defendants' Codes prohibiting "records that fail to record improper transactions' and records that are falsified to disguise aspects of improper transactions that were otherwise recorded correctly," Defendants sent the Plaintiffs and Class members consignment accountings that failed to record improper transactions and disguised aspects of improper transactions that were otherwise correctly recorded.

108.   Despite Defendants' Codes' "commitment to the highest standards of business ethics," Defendants' consignment accountings to the Plaintiffs and Class members were false, deceptive, incomplete, misleading, and rendered in a manner to hide CHR's secret profits and unauthorized expenditures it makes at the expense of Plaintiffs and Class members.

109.   Acting in their own self-interest and in direct conflict with the interests of their principals and in breach of their promise under the Agreements to obtain the best prices for the Growers' Products, Defendants engaged in practices designed to exact additional profits from the sales transactions to the detriment of the Growers.

110.   These practices included undisclosed freight topping, undisclosed prompt payment discounts, undisclosed vendor rebates, and misrepresenting unauthorized charges.

111.   Defendants facilitated the withholding of information about these practices by maintaining two sets of books.

### *Undisclosed Freight Topping.*

112.   Under the terms of the transactions selling Products to Customers, the Products be transported from the Grower's location to the Customer's location.

113.    Defendants withheld the true cost of transportation when reporting to the Growers the true cost of transportation chargeable to the sales transaction.

114.    Instead, Defendants charged the sales transaction with a transportation expense in an amount greater than the true cost of transportation without disclosing it was doing so to the Growers and without obtaining their prior approval.

115.    By maintaining two sets of books, Defendants were able to hide their freight topping practices from the Growers.

### *Undisclosed Prompt Payment Discounts.*

116.    Defendants also received the financial benefit of a secret prompt payment discount on freight charges from transportation providers through its transportation agreements.

117.    By agreeing to accept less than the contracted amount for shipping, Defendants paid truckers more promptly than the contracts required in consideration from the truckers' acceptance of a lesser amount.

118.    Defendants did not disclose to Growers that they had obtained these discounts and they are not reflected in Defendants' reports to Growers.

119.    Instead, Defendants reported that full amount of the truckers' contracts as a chargeable expense against the sales transactions.

120.    By maintaining two sets of books, Defendants were able to hide the prompt payment discounts from the Growers.

***Undisclosed Vendor Rebates.***

121.    In or about 2015 or 2016, a group of Growers who were supplying watermelons to Defendants, including Plaintiff, JMR Farms, Inc., attended a meeting with Defendants' representatives to explore whether Defendants might assist these Growers in lowering the cost of the parties who supplied goods and services needed by the Growers in their good faith performance under the Agreements.

122.    Defendants did negotiate terms with those third-party suppliers but never disclosed to any Grower that Defendants had also negotiated for themselves rebates which the suppliers agreed to pay Defendants whenever a Grower purchased goods or services from those suppliers.

123.    The suppliers included the Growers' seed suppliers, CHEP USA (a pallet rental supplier), and other third-party providers.

124.    To ensure that Defendants received the secret rebates, Defendants employees were required to provide the name of any new Grower to Joanne Dalton, Defendants' employee responsible for policing the suppliers' payment of rebates to Defendants.

125.    Defendants never told the Plaintiffs they were receiving these rebates from Plaintiffs' third-party vendors.

126.    Defendants kept the rebates from the third-party suppliers and did not remit them to any Grower.

### *Misrepresenting Unauthorized Charges.*

127.    Defendants also paid promotional rebates, expenses and allowances to Customers and made charitable donations in Defendants' name which Defendants charged against the proceeds from the sale of the Grower's Products but, under the Agreements, none of those items were appropriate charges to the sales transactions.

128.    Nevertheless, when reporting to the Growers, Defendants misrepresented the true nature of those payments to disguise them as if they were permitted charges under the Agreements.

129.    For example, according to their website, https://melonup.com/pink-ribbon/ (accessed March 30, 2020), Defendants began the "MelonUp!® Pink Ribbon Watermelons" program" in 2007 "to positively impact the fight for a cure for breast cancer."

130.    Under the program, Defendants claim to "endeavor to help the estimated 1 in 8 women who will be affected by this cancer, and to never give up the fight for a cure." *Id.*

131.    The same website proclaims, "Every juicy bite of a MelonUp! Pink Ribbon melon helps to fund critical breast cancer research."

132.    The money which Defendants claim to have donated under the program was disguised in Defendants' accountings as a chargeable expense against the sales price. Thus, unbeknownst to them, the Plaintiffs and other Growers were actually funding the donations which Defendants took credit for.

133.    Defendants did not obtain the consent or authorization from Plaintiffs or other Growers to charge them for donations to fight breast cancer with Defendants taking full credit as the donor.

### H. The Gap Between What Defendants Should Have Done and What They Did.

134.    Defendants was required by the Agreements and by applicable federal and state law to truly and accurately account to all Growers, including Plaintiffs and the Class members, for all Products received on consignment.

135.    Although Defendants required their Growers and Defendants' employees to keep accurate books of all dealings with and within Defendants, they did not hold themselves to their own standards.

136.    Defendants provided the Growers with false or deceptively incomplete accountings of Product sales by limiting the information they recorded in their different software systems.

137.    Accountings of freight profits earned by Defendants were only reported in Navisphere and, therefore, never reported to Plaintiffs or Class members.

138.    An USDA auditor auditing the information in Defendants' Famous produce accounting software would likewise be unaware of Defendants' secret freight profits because the information about the freight profits were not recorded in the Famous software from which Defendants generated accounting reports for Plaintiffs.

139.    The reports Defendants sent to Plaintiffs and Class members by means of interstate communications were materially false because the reports inaccurately

accounted for freight charges and did not disclose the secret, unauthorized profits on freight and the secret freight price reductions from truckers.

140.    Under both state and federal law, Defendants should have reported and paid to the Growers including Plaintiffs and Class members the secret profits Defendants made because Plaintiffs had appointed Defendants as their exclusive sales agent.

141.    The rebates, promotional allowances and expenses were unauthorized by and undisclosed to Growers (including Plaintiffs and Class members) and, thus, were improperly deducted from the sales returns provided to Plaintiffs and Class members.

142.    In its 2018 10-K filing with the United States Securities Exchange Commission ("SEC"), page 4, CHRW states as follows:

> Transportation and Logistics Services
>
> CHRW provides freight transportation and related logistics and supply chain services. Our services range from commitments on a specific shipment to much more comprehensive and integrated relationships. We execute these service commitments by investing in and retaining talented employees, developing cutting edge proprietary systems and processes, and utilizing a network of contracted transportation providers, including, but not limited to, contract motor carriers, railroads, and air and ocean carriers. We make a profit on the difference between what we charge to our customers for the totality of services provided to them and what we pay to the transportation providers to handle or transport the freight. While industry definitions vary, given our extensive contracting to create a flexible network of solutions, we are generally referred to in the industry as a third-party logistics company.
>
> We provide the following transportation and logistics services:

- Truckload: Through our contracts with motor carriers, we have access to dry vans, temperature-controlled vans, flatbeds, and bulk capacity. We connect our customers with carriers who specialize in their transportation lanes and product types, and we help carriers optimize the usage of their equipment.

- Less than Truckload: ("LTL") transportation involves the shipment of single or multiple pallets of freight. We focus on shipments of a single pallet or larger, although we handle any size shipment. Through our contracts with motor carriers and use of Navisphere, we consolidate freight and freight information to provide our customers with a single source of information on their freight. In many instances, we will consolidate partial shipments for several customers into full truckloads.

143.   CHRW changed its financial reporting of freight revenues within the Robinson Fresh® division in its mandatory filings with the SEC commencing with its 8-Q report on May 1, 2019.

144.   CHRW stated in its 8-Q that it would no longer separately report freight revenues for Robinson Fresh® as part of its required SEC filings.

145.   Allegations of CHRW's practices of making additional profits on freights on consignment transactions were first made public in an amendment in a suit against Defendants in 2019.

146.   Prior to that date, Defendants did not inform Growers that they made additional revenue from freight topping.

147.   Defendants' employees within the Robinson Fresh® division were aware of the accounting practices described above, but they did nothing to correct it.

148.    In 2017, a CHRW employee raised the issue of the propriety of these practices of making additional undisclosed revenue on its transportation of consigned produce loads to CHRW's management but management instructed the employee that they CHRW was not "going to open that can of worms."

149.    On information and belief, Defendants rely upon a data mining software system, Cognos, which can readily report the amount of additional profit earned from freight topping.

150.    The Defendants did not account to or pay Plaintiffs or Class members the additional undisclosed profits they earned from freight topping.

151.    Plaintiffs were repeatedly informed by Defendants' representatives that, subject to limited exceptions, Defendants' policy was to not use trucks to transport consignment shipments of consigned produce to ultimate customers unless the trucks were obtained by Defendants.

152.    Defendants' dual capacity as an exclusive fiduciary consignment sales agent for the Plaintiffs, Class members, and other Growers, as well as effectively being the party who sought third-party transportation services for Products which Defendants handled under the Agreements created an inherent, but undisclosed, conflict of interest.

## VI.  CLASS ALLEGATIONS

153.    Plaintiffs bring this action individually and as a class action on behalf of all other persons similarly situated pursuant to FED. R. CIV. P. 23.

154.    *Class Definition.* Subject to discovery and further investigation which may cause Plaintiffs to modify the class definition to be more inclusive or less inclusive, Plaintiffs define the "Class" as:

> Each person identified in a written contract ("Agreement") as either "Grower" or "Grower/Supplier" where the other party named in the Agreement is either (*i*) C.H. Robinson Company or (*ii*) C.H. Robinson Company, Inc. and the Agreement includes the Grower's appointment of the other party "as its exclusive sales agent."

155.    *Class Claims.* Subject to discovery and further investigation which may cause Plaintiffs to modify the definition of the "Class Claims" to be more inclusive or less inclusive, Plaintiffs define the Class Claims as:

> A claim based on an allegation of freight topping, prompt-payment discounts to truckers, rebates paid by a third-party to a Defendant arising from the class member's purchase of goods or services from that third-party, or of a Defendant's misrepresentation of an amount which a Defendant used to reduce a Defendant's remittance made pursuant to an Agreement.

156.    Based on discovery and further investigation, Plaintiffs may, in addition to moving for class certification using modified definitions of the Class and the Class Claims, seek class certification only as to particular issues as permitted under FED. R. CIV. P. 23(c)(4).

157.    The identity of each member of the Class is readily ascertainable from Defendants' records.

158.    This action has been brought and may properly be maintained as a class action pursuant to the provisions of FED. R. CIV. P. 23(a) because there is a well-defined community interest in the litigation in that:

158.01.    *Numerosity.* Plaintiffs are informed and believe, and on that basis allege, that there are at least 40 members of the Class and is so numerous that joinder of all members would be impractical.

158.02.    *Commonality.* Common questions of law and fact exist as to all members of the Class. The principal issues include whether Defendants' conduct as alleged in this Complaint was the same or substantially similar with respect to members of the Class, and whether such conduct violated PACA and/or state law.

158.03.    *Typicality.* Each Plaintiff's claims are typical of the claims of the Class. Plaintiffs and all members of the Class have claims arising out of Defendants' common and uniform course of conduct as alleged in this Complaint.

158.04.    *Adequacy.* Each Plaintiff will fairly and adequately protect the interests of the Class insofar as no Plaintiff has interests that are known or believed to be averse to the absent members of the Class. The Plaintiffs are committed to vigorously litigating this matter. Plaintiffs have also retained counsel experienced in handling complex legal issues and class actions. Plaintiffs and Plaintiffs' counsel have no interests which might cause them not to vigorously pursue the instant class action lawsuit.

159.    This action may be maintained as a "B1a-class", a "B2-class", a "B3-class", or a hybrid of any two or all three types however, at the time of commencing this action, Plaintiffs expect to seek certification of a class under Fed. R. Civ. P. 23(b)(3) because the questions of law and fact common to members of the Class predominate over any questions affecting an individual member, and a class action would be superior to other available methods for the fair and efficient adjudication of the controversy because individual joinder of all members would be impracticable, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum efficiently and without unnecessary duplication of effort and expense that individual actions would engender, an important public interest will be served by addressing the matter as a class action, substantial expenses to the litigants and to the judicial system will be realized, and difficulties are unlikely in the management of a class action.

## VII.   FIRST CAUSE OF ACTION FOR BREACH OF DUTIES UNDER PACA.

160.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

### A. Defendants Are Subject to PACA.

161.    Each Product described in Plaintiffs' Agreements is a "perishable agricultural commodity" within the meaning of 7 U.S.C. § 499a(4) and is "produce" within the meaning of 7 C.F.R. 46.2(t) because the Products include fresh mini seedless melons, fresh seedless watermelons, fresh broccoli, fresh pumpkins, and other fresh fruits and vegetables.

162.    Defendants and each of them are a "commission merchant" within the meaning of 7 U.S.C. § 499a(b)(5) and 7 C.F.R. 46.2(r) because Defendants' joint and collective operation of the Robinson Fresh business involves receiving the Products for sale, on commission, or for or on behalf of another in interstate commerce.

163.    Defendants and each of them are a "dealer" within the meaning of 7 U.S.C. § 499a(b)(6) and 7 C.F.R. 46.2(m) because Defendants' joint and collective operation of the Robinson Fresh business involves selling in wholesale the Products in interstate commerce.

164.    Defendants and each of them are a "broker" within the meaning of 7 U.S.C. § 499a(b)(7) and 7 C.F.R. 46.2(n) because Defendants' joint and collective operation of the Robinson Fresh business involves negotiating sales and purchases of the Products for or on behalf of the Plaintiffs as the vendors in interstate commerce.

165.    At all times relevant to this Complaint, Defendants and each them, having carried on the business of a commission merchant, dealer, or broker, was required to hold what is commonly called a "PACA license" issued by the Secretary of Agriculture. 7 U.S.C. § 499c; 7 C.F.R. 36.3 (requiring, among other things, that "[s]eparate licenses are required for each person.")

166.    Despite representations and sworn statements to the contrary, CHRW never held a PACA license.

### B. PACA's Recordkeeping Requirements.

167.    "Every commission merchant, dealer, and broker shall keep such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his

business, including the true ownership of such business by stockholding or otherwise." 7

U.S.C. § 499i; 7 C.F.R. 46.14.

168.   Under 7 C.F.R. 46.15, such accounts, records, and memoranda include:

> Bills of lading, diversion orders, paid freight and other
> bills, car manifests, express receipts, confirmations and
> memorandums of sales, letter and wire correspondence,
> inspection certificates, invoices on purchases, receiving
> records, sales tickets, copies of statements (bills) of sales
> to customers, accounts of sales, papers relating to loss
> and damage claims against carriers, records as to
> reconditioning, shrinkage and dumping, daily inventories
> by lots, a consolidated record of all rebates and
> allowances made or received in connection with
> shipments handled for the account of another, an itemized
> daily record of cash receipts, ledger records in which
> purchases and sales can be verified, and all other
> pertinent papers relating to the shipment, handling,
> delivery, and sale of each lot of produce.

169.   All records required to be preserved under the PACA must be organized in

a "proper method which will enable the licensee to promptly locate and produce the

records." 7 C.F.R. 46.16.

170.   Defendants are required by PACA regulations, specifically 7 CFR 46.29(a)

as a commission merchant and 46.32(b) as a grower's agent, to maintain a complete

archive of all transactions, charges and sales related to each lot of produce received on

consignment from all suppliers, including Plaintiffs.

### *C. Defendants' Duties Owed to Plaintiffs Under PACA.*

171.   Under PACA, Defendants owe each Plaintiff a duty to truly and correctly

account and make full payment promptly in respect of each sale of the Plaintiff's

Products.

172.    Under PACA, Defendants owe each Plaintiff a duty to not make, for a fraudulent purpose, any false or misleading statement in connection with each transaction involving the Plaintiff's Products which were received by Defendants in their capacity as a commission merchant.

173.    Under PACA, Defendants owe each Plaintiff a duty to not make, for a fraudulent purpose, any false or misleading statement in connection with each transaction involving the Plaintiff's Products which were bought or sold, or contracted to be bought, sold, or consigned by Defendants in their capacity as a dealer.

174.    Under PACA, Defendants owe each Plaintiff a duty to not make, for a fraudulent purpose, any false or misleading statement in connection with each transaction involving the Plaintiff's Products which were purchased or sold by Defendants in their capacity as a broker.

175.    Under PACA, Defendants owe each Plaintiff a duty to perform any specification or duty, express or implied, arising out of any undertaking in connection with each transaction involving Plaintiff's Products.

### D. Defendants' Breach of Duties Owed to Plaintiffs.

176.    Defendants' breached their duties to each Plaintiff by failing to disclose and account for freight topping.

177.    Defendants' breached their duties to each Plaintiff by failing to disclose and account for its prompt-payment discounts.

178.    Defendants' breached their duties to each Plaintiff by failing to disclose, account for, and remit their receipt of vendor rebates.

179.    Defendants' breached their duties to each Plaintiff by misrepresenting unauthorized promotional expenses as if they were authorized charges against the proceeds from the sale of the Plaintiffs' Produce.

180.    Defendants' breached their duties to each Plaintiff by misrepresenting unauthorized donations as if they were authorized charges against the proceeds from the sale of the Plaintiffs' Produce.

181.    Defendants' breached their duties to each Plaintiff by failing to promptly pay each Plaintiff the full amounts owed under a true and accurate accounting.

182.    Defendants' breached their duties to each Plaintiff by their breach of their express and implied duties under the Agreements including, but not limited to, endeavoring to obtain the best price from Plaintiffs' Products and to remit the full amount of the proceeds from each sale after deducting only authorized charges.

183.    Defendants' breached their duties to each Plaintiff by actively preventing the discovery of the information which should have been disclosed under PACA, its regulations, and the Agreements by maintaining two sets of books which allowed Defendants to provide Plaintiffs with false and incomplete accountings but which appeared to be true and accurate.

184.    Under PACA, Defendants owed each Plaintiff and the other Growers an affirmative duty to not profit from their exclusive consignor's sales agency without the informed expressed consent from the consignor.

### E. Damages.

185.   PACA contains a civil remedy for breaches of unfair conduct in 7 U.S.C.

§ 499e(a) and (b)(1).

186.   As a direct, proximate, legal, and foreseeable cause of Defendants' breach

of their duties to each Plaintiff arising under PACA, Plaintiffs have been damaged in an

amount of the difference between the true transportation costs and the transportation costs

charges against the proceeds of the sales, the amount of all vendor rebates, the amount of

unauthorized promotional expenses and donations charged against the proceeds of the

sales.

187.   Under PACA, Defendants stand in a fiduciary capacity to account for each

Plaintiff's Products and the proceeds from the sale of those Products. Based on

Defendants' fiduciary duties under PACA, Defendants should be ordered to comply with

an audited accounting of the proceeds of each sale and of all vendor rebates which will

fix the amount of each Plaintiff's damages including, but not limited to all sales revenues,

freight charges, freight discounts, seed rebates, pallet rental rebates and any other net

revenues obtained by Defendants in addition to the agreed commissions received under

the 2012 through 2019 Agreements.

## VIII.   SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT.

188.   Plaintiffs re-allege and incorporate by reference the foregoing allegations as

though fully set forth in this paragraph.

189.    Through their joint enterprise, unincorporated association, or *de facto* partnership under the Robinson Fresh moniker, Defendants entered into Agreements with Plaintiffs.

190.    Pursuant to those Agreements, Defendants made certain representations and promises.

191.    Each Plaintiff has fully or substantially performed all of its obligations under the Agreements.

192.    Based on the facts alleged in this Complaint, Defendants breached their promises under the Agreements including, but not limited to Defendants' duties arising as each Plaintiff's exclusive sales agent, Defendants' promise to endeavor to obtain the "best prices" for the Plaintiff's Products, and Defendants' promise to truly and accurately account for the proceeds from each sale and to remit the net proceeds to each Plaintiff.

193.    As a direct, proximate, legal, and foreseeable cause of Defendants' breach of their duties to each Plaintiff arising under the Agreements, Plaintiffs have been damaged in an amount of the difference between the true transportation costs and the transportation costs charges against the proceeds of the sales, the amount of all vendor rebates, the amount of unauthorized promotional expenses and donations charged against the proceeds of the sales.

194.    As the prevailing party, each Plaintiff is entitled to recover its reasonable attorney's fees from Defendants.

## IX.  THIRD CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY.

195.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

196.    The Agreements contain multiple references to Defendants as "agent."

197.    The Agreements expressly state that the "Grower hereby appoints [Defendants] as its exclusive sales agent for the sale of all Products."

198.    Separate and apart from PACA's provisions for a statutory trust, PACA provides that sales agents owe their principals a fiduciary duty to place the principal's interest above that of the agent, to correctly account for their sales activities, revenues and expenses and more particularly to not make a secret, self-dealing profit from the subject matter of the agency.

199.    Consignment transactions under PACA are fiduciary transactions in which the consignee (*i.e.*, the Defendants) must exercise a high degree of care to protect the interests of the consignor (*i.e.*, each Plaintiff).

200.    Under PACA, a consignee's fiduciary duty includes providing an accurate accounting and that duty is separate and distinct from Defendant's fiduciary duty as a trust under PACA's statutory trust.

201.    Under the common law of Minnesota, agents such as Defendants are fiduciaries with respect to the principal which has been described as follows:

> One acting in a fiduciary capacity must exercise the utmost fidelity toward the principal, [citation omitted] and owes the principal a duty of full disclosure [citation omitted]. An agent cannot profit from the subject of the agency without the principal's consent, freely given after

> full disclosure of any facts that might influence the
> principal's judgment.

*Carlson v. Carlson*, 363 N.W.2d 803, 805 (Minn. Ct. App. 1985).

202.   "Agency" is defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Urban v. Am. Legion Dep't of Minnesota*, 723 N.W.2d 1, 12 (Minn. 2006) (quoting Restatement (Second) of Agency § 1(1)).

203.   By executing the Agreements, Plaintiffs each manifested consent that Defendants act as their exclusive sales agent subject to the limits imposed by the Agreements.

204.   The Restatement (Illustration 1 under § 1) gives an illustration of an agency which, but for using terms of sale (as opposed to the Agreements' expressed disclaimer of any sale from a Plaintiff to Defendants), describes substantially the same facts as here and concludes there is an agency relationship:

> P and A enter into an agreement which is stated to be a
> "contract of sale." It provides that for one year A shall
> purchase a specified amount of goods from P; that the risk
> of loss of such goods after purchase is upon P, if A uses
> care in their custody; that A is to pay for and to sell them
> at prices to be fixed by P from time to time and is to keep
> the proceeds as a separate account, remitting monthly 90
> per cent. and keeping the remainder for himself; that
> unsold goods can be returned to P; and that P will pay A
> one-half of A's selling expenses. A is P's agent.

205.   The relationship between Defendants and Plaintiffs was that of agent and principal because, among other facts:

205.01.    The Agreements expressly provide that the Grower appoints

Defendants as the Grower's exclusive sales agent.

205.02.    The Agreements expressly provide that Defendants have not

purchased the Products "but is selling the Products on Grower's behalf to

third party customers."

205.03.    The Agreements, having been drafted by Defendants, state that both

title to and the risk of loss of the Products are retained by the Grower until

the Customer accepts them.

205.04.    There is no agreement on the Products' sales price between

Defendants and each Plaintiff; instead, Defendants agree that, after entering

into the Agreement, Defendants will negotiate a final sales price—

endeavoring to obtain the best price for the Grower—with the ultimate

buyer and to charge a commission based on that price with the remaining

amount to be remitted to the Plaintiff.

205.05.    Defendants are required to report to each Plaintiff the final sales

prices upon which its commissions were determined and paid.

205.06.    Each Plaintiff retained a limited right to demand inspections of

Products for which customers had a complaint regarding quality or

condition at delivery.

205.07.    The Products consigned to Defendants were delivered in a complete

form. Defendants were not required to make any alteration.

205.08.    Each Plaintiff retained the right to terminate the Agreement and, in

some cases, the Agreement was subject to an annual right of either party to

terminate it.

205.09.    If a customer rejected any load of a Plaintiff's Products, each

Plaintiff retained the right to retake possession of its Products.

206.    Under Minnesota common law, Defendants' agency relationship with each

Plaintiff made Defendants "a fiduciary with respect to matters within the scope of his

agency." Restatement (Second) of Agency § 13.

207.    Defendants, as the exclusive sales agent for each Plaintiff's Products, owed

fiduciary duties under both Minnesota law and under PACA in connection with its receipt

of Products on consignment. Such duties include the duty to not pursue Defendants' own

interests which are in conflict with Plaintiffs' interests without Plaintiffs' informed, prior

expressed consent.

208.    Defendants' undisclosed freight topping, prompt payment discounts,

vendor rebates, the imposition and mischaracterization of unauthorized charges against

the proceeds from sales, and the reporting of incomplete and inaccurate accounting of

those proceeds facilitated by maintaining separate books breached Defendants' fiduciary

duties owed to each Plaintiff.

209.    The sales reports which Defendants provided to Plaintiffs do not reflect the

substantial, secret, self-dealing profit that Defendants secured in advancing their own

interest while disregarding each Plaintiff's interests.

210.    Defendants engaged in freight topping, kept the prompt payment discounts for itself, and kept the vendor rebates secret from the Plaintiffs and other Growers, knowing that such practices advanced their own self-interest while being in conflict with the Growers' interests.

211.    The foregoing breaches of Defendants' fiduciary duties including, but not limited to, their duty of loyalty, were material.

212.    A CHRW supervising employee conducted an internal audit using the Cognos data mining software to sample randomly selected growers to verify the extent of freight topping and freight topping occurred for all three of the selected growers.

213.    As a direct, proximate, legal, and foreseeable cause of Defendants' breach of their fiduciary duties to each Plaintiff, Defendants are liable to Plaintiffs for all profits Defendants received from the difference between the true transportation costs and the transportation costs charges against the proceeds of the sales, the amount of all vendor rebates, the amount of unauthorized promotional expenses and donations charged against the proceeds of the sales. Restatement (Second) of Agency § 399.

214.    In their fiduciary capacity as each Plaintiff's agent, Defendants should be ordered to comply with an audited accounting of the proceeds of each sale and of all vendor rebates which will fix the amount of each Plaintiff's damages including, but not limited to all sales revenues, freight charges, freight discounts, seed rebates, pallet rental rebates and any other net revenues obtained by Defendants in addition to the agreed commissions received under the 2012 through 2019 Agreements. *Id.*

215.   The common law of Minnesota provides for Defendants' forfeiture of commissions because Defendants' breaches of their fiduciary duties were material.

216.   Defendants' substantial and intentional breach of its fiduciary duties owed to Plaintiffs make all sales commissions charged to Plaintiffs for produce sales during the years 2012 through 2018 subject to forfeiture.

217.   Based on Defendants' breach of fiduciary duties, Defendants are subject to punitive or exemplary damages.

218.    Minnesota statute § 649.20 provides that a court or jury may award punitive damages upon clear and convincing evidence that:

> A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

219.   CHR as a sales agent owed each Plaintiffs a fiduciary duty under PACA and Minnesota common law to accurately account for produce received, sold and expenses incurred in produce transactions.

220.   A breach of fiduciary duty can give rise to punitive damage claims under Minnesota law. CHR breached its fiduciary duty to Plaintiffs and acted with deliberate disregard for the rights of Plaintiffs by its conduct of issuing false accountings of freight charges, seed rebates and pallet rebates.

221. CHR acted with deliberate disregard to the rights of Plaintiffs by CHR's affirmative efforts to conceal its false accountings by means of two sets of books, Famous for grower accounting and Navisphere or Compass for freight accounting.

222. CHR's deliberate disregard of the rights of Plaintiffs and other growers is also shown by comparing the standard of conduct for accurate financial reporting that CHR requires of its growers, such as Plaintiffs, and employees, described in paragraphs 92 through 97 with the far lower standard of CHR observed in its consignment accountings to Plaintiffs. The conduct described in this First Amended Complaint would be unacceptable if done by either a CHR grower or employee against CHR.

223. CHR's conduct of obtaining seed rebates, pallet rental rebates, storage profits, freight discounts and freight topping profits and rebates from consignment growers is emblematic of CHR's true corporate culture. This knowing and purposeful conduct is in stark contrast to the standards to which it demands of its employees and growers such as Plaintiffs and such conduct was carried out in deliberate disregard of the rights of growers such as Plaintiffs.

224. CHR management was aware of the processes that permitted profiting on freight topping, seed and pallet rental rebates. These additional, unauthorized profits were not a mistake or unknown, but rather an intentional feature of Robinson Fresh's business model to provide additional freight revenues to CHR. A supervisory employee utilized CHR's Cognos data mining software to specifically track the profitability of freight topping from the consignment contracts of three CHR consignment growers.

225. Among the standards for imposition of punitive damages in Minnesota is

the requirement that the fact finder evaluate "the severity of any criminal penalty to which the defendant may be subject." CHR sent Plaintiffs its false sales reports and liquidations by means of email or the US Postal Service. Plaintiffs' payments were sent to them through interstate banking channels. CHR engaged in a pattern conduct by transmission of false liquidations which would qualify as wire and mail fraud by means of instrumentalities of interstate commerce. Thus, the potential criminal penalties under 18 U.S.C. §§ 1341 and 1343 for mail fraud and wire fraud should be considered in any assessment of punitive damages.

226.   Finally, the deliberate disregard to the rights of consignment growers such as Plaintiffs is further shown in the refusal of CHR to "open a can of worms" when asked about the false expense accountings for freights.

227.   For these reasons, upon a showing by clear and convincing evidence Plaintiffs are entitled to an award of punitive damages against CHR.

## X.   FOURTH CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

228.   Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

229.   Every contract includes an implied covenant of good faith and fair dealing.

230.   Under the PACA regulations, 7 C.F.R. 46.2(hh):

> Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. The principle of good faith requires that a party to a transaction disclose in writing the existence of any collateral fees and expenses to all other parties to the

transaction where the collateral fees and expenses affect
a material term of the agreement.

231.    The acts and omissions of Defendants violated the implied covenant of
good faith and fair dealing in that Defendants have been dishonest in fact and has not
disclosed all the material information concerning the charges Defendants made against
the proceeds from the sales which reduced the net payable to each Plaintiff.

232.    Plaintiffs seeks recovery of damages due to Defendants' breach of implied
duty of good faith and fair dealing, court costs, and attorneys' fees.

## XI.   PRAYER FOR RELIEF.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,
respectfully request the Court enter final judgment against Defendants, C.H. Robinson
Worldwide, Inc., C.H. Robinson Company, Inc., and C.H. Robinson Company, jointly
and severally, as follows:

232.01.    Certifying that the Causes of Action may be maintained as a class
pursuant to FED. R. CIV. P. 23 including defining the Class, defining Class
Claims, appointing Plaintiffs to represent the Class, and appointing
Plaintiffs' counsel to act as class counsel;

232.02.    For an accounting of the proceeds from each sale and of all vendor
rebates including, but not limited to all sales revenues, freight charges,
freight discounts, seed rebates, pallet rental rebates and any other net
revenues obtained by Defendants in addition to the agreed commissions
received under the 2012 through 2019 Agreements.

232.03.   For damages in such amount as determined by the foregoing accountings or otherwise proven;

232.04.   For damages in the amount of Defendants' commissions subject to forfeiture;

232.05.   For punitive or exemplary damages;

232.06.   For reasonable attorney's fees;

232.07.   For pre-judgment interest;

232.08.   For costs of suit; and

232.09.   For such other and further relief as may be just and proper.

## XII.   JURY DEMAND.

233.   Plaintiffs demand trial by jury.

Respectfully submitted,

Dated: September 1, 2020

*DRAFT*

Craig A. Stokes (MN Attorney ID # 0390849)
STOKES LAW OFFICE LLP
3330 Oakwell Court, Suite 225
San Antonio, TX 78218
Telephone: (210) 804-0011
Email: cstokes@stokeslawofffice.com

*Attorney for Plaintiffs*