UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JMR FARMS, INC. et al., individually and on behalf of all others similarly situated, | Case No. 20-CV-0879 (PJS/ECW) |
| Plaintiffs, | ORDER |
| v. | |
| C.H. ROBINSON WORLDWIDE, INC. et al., | |
| Defendants. | |

Richard M. Paul III, Sean R. Cooper, Laura C. Fellows, and Steven L. Rowe, PAUL LLP; Craig A. Stokes, STOKES LAW OFFICE LLP; Jennifer Neal, Francisco Guerra, IV, and Mark Fassold, WATTS GUERRA LLP; and Robert A. Pollom, LOYD & POLLOM, PPLC, for plaintiffs.

Mark W. Wallin and Christina M. Janice, BARNES & THORNBURG, LLP; and Patrick J. Rooney and Bradley R. Hutter, FAFINSKI MARK & JOHNSON P.A., for defendants.

Plaintiffs Bonne Idee Produce, LLC ("Bonne Idee") and Bowles Farming Company, Inc. ("Bowles") are produce farmers. Plaintiffs contracted with defendant CHR,[1] a third-party logistics company, to market, sell, and transport their produce to grocers, restaurants, and other buyers. CHR charged a commission to plaintiffs for its services. Plaintiffs later learned that CHR also profited by adding a markup to the

---

[1] Defendants C.H. Robinson Company and C.H. Robinson Company, Inc. are subsidiaries of defendant C.H. Robinson Worldwide, Inc. The Court refers to the defendants collectively as "CHR."

amount that CHR charged to buyers to transport the produce. Plaintiffs refer to this practice as "freight topping," because CHR "tops" the actual cost of freight by adding a markup. According to plaintiffs, although this markup was charged to the buyer in form, it was paid by the grower in substance, as the more that CHR took as its markup, the less that the grower received for its produce. Plaintiffs say that CHR never disclosed this practice to them.

Plaintiffs brought this putative class action on behalf of themselves and other growers who were allegedly harmed by CHR's freight topping. Plaintiffs allege that CHR's freight topping was unlawful for three reasons: (1) it violated the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a et seq.; (2) it breached a fiduciary duty that CHR owed to plaintiffs; and (3) it breached the contracts between CHR and plaintiffs.

In October 2021, plaintiffs moved to certify a class of similarly situated produce farmers. ECF No. 89. At the conclusion of the hearing on plaintiffs' motion, the Court determined that, before it could decide whether to certify a class, it needed to resolve certain legal questions. ECF No. 134. The Court directed the parties to file cross-motions for summary judgment in order to resolve these questions. ECF No. 142. The matter is now before the Court on the parties' cross-motions. ECF Nos. 157, 163.

I.  BACKGROUND

*A. Delivered-Sale Transactions*

Plaintiffs are farmers who entered into contracts with CHR to sell their produce. *See, e.g.*, ECF No. 165-5 (2017 Growing, Packing, and Sales Agreement between CHR and Bonne Idee Produce, LLC); ECF No. 165-7 (2017 Growing, Packing, and Sales Agreement between CHR and Bowles Farming Company).  Pursuant to these contracts, CHR sold plaintiffs' produce on consignment in what are called "delivered-sale" transactions.  Delivered-sale transactions are those in which CHR arranges to transport produce from the growers to the grocers, restaurants, and others who buy the produce from CHR.  Am. Compl. ¶¶ 78–79 [ECF No. 67].  Each buyer pays CHR a single amount that covers both the cost of the produce and the cost of the freight.  *See* Def. Memo. Supp. Partial S.J. ("Def. Memo.") at 3 [ECF No. 164]; Paul Decl. Ex. 10 at 73:12–74:11 [ECF No. 160-13].

In quoting a delivered-sale price to a prospective buyer, CHR does not separately quote produce costs and freight costs.[2]  Rather, CHR quotes a single, all-inclusive price. The grower, of course, does not receive the delivered-sale price paid by the customer. Rather, the grower receives the "FOB price," which is the amount paid by the customer

---

[2]This is in contrast to "FOB sales," in which the buyer and seller agree only on the price of the produce, and either the buyer or the seller (depending on the type of FOB sale) must make a separate arrangement to ship the produce.  ("FOB" is an acronym for "free on board.")

minus the cost of freight. The grower also pays a commission to CHR that is "typically eight to ten percent" of the FOB price. Pl. Memo. Supp. Partial S.J. ("Pl. Memo.") at 4 [ECF No. 159].[3] For its part, CHR receives not only its commission from the grower, but a markup on the freight charged—described in CHR's 2012 annual report as "the difference between what we charge to our customers for the totality of services provided to them and what we pay to the transportation providers to handle or transport the freight." Paul Decl. Ex. 11 at 3 [ECF No. 160-14].

Delivered-sale transactions are summed up in the following table:

> **Delivered-sale price (paid by customer)** = [FOB price (produce cost)] + [freight cost]
>
> **CHR commission** = [FOB price] x [commission rate]
>
> **Sales return to plaintiffs** = [FOB price] – [CHR commission]

### B. Plaintiffs' Theory of Harm

CHR's freight topping is at the heart of this lawsuit. A simplified example will illustrate how plaintiffs allege that CHR engages in freight topping:

Suppose that Kowalski's Markets pays $125 to CHR for a bin of watermelons delivered to one of its grocery stores in Minnesota. And suppose that CHR pays a trucking company $25 for transporting that bin of watermelons from Bonne Idee's farm

---

[3]Plaintiffs' sales returns are also reduced by any advances and expenses CHR paid on plaintiffs' behalf. *See* Paul Decl. Ex. 9 at 18 [ECF No. 160-11].

in Louisiana to the Kowalski's store in Minnesota.  According to plaintiffs, CHR does not simply pay the remaining $100 to Bonne Idee (minus CHR's commission).  Instead, CHR deducts an additional fee (say, $15), which CHR portrays as compensation for the time it devoted to arranging for the trucking company to transport the watermelons to Kowalski's.  *See* Paul Decl. Ex. 9 at 20.  When plaintiffs refer to "freight topping," they are describing CHR's practice of "topping" the actual freight charge (i.e., the $25 paid to the trucking company) with this ($15) markup.

Plaintiffs allege that CHR hid this practice from them.  According to plaintiffs, "CHR's accounting of [delivered-sale] transaction[s] to the Plaintiffs disclosed only the FOB price; it did not disclose the freight markup or the total sales proceeds."  Pl. Memo. at 5.  Moreover, plaintiffs contend that even though the buyers are nominally responsible for all freight-related charges (including the freight markup), the growers bear the economic impact of freight topping.  According to plaintiffs, when a customer such as Kowalski's pays a particular amount for a bin of produce delivered to its door ($125 in the above example), that customer does not know or care what portion is allocated to produce and what portion is allocated to freight, freight markups, or something else.  Meanwhile, CHR has exclusive control over this allocation, and CHR has an incentive to allocate more of the delivered-sale price to freight markups (all of which CHR can keep as pure profit) than to the FOB price (only some of which CHR

can keep as commissions).  Because freight topping lowers the FOB price, plaintiffs say, they end up bearing the economic impact of the practice.

The following chart demonstrates plaintiffs' theory of harm:

| **Without Freight Topping** | **With Freight Topping** |
|---|---|
| Delivered-sale price: $125/bin | Delivered-sale price: $125/bin |
| Cost of freight: $25/bin | Cost of freight: $25/bin |
|  | Freight markup: $15/bin |
| FOB price: $100/bin ($125/bin – $25/bin freight) | FOB price: $85/bin ($125/bin – $40/bin freight + markup)) |
| CHR keeps $10/bin (10% commission) | CHR keeps $23.50/bin ($8.50 (10% commission) + $15 markup) |
| Sales returns to plaintiffs: $90/bin ($100 FOB – $10 commission) | Sales returns to plaintiffs: $76.50/bin ($85 FOB – $8.50 commission) |
| **Plaintiffs receive $13.50/bin *less* with freight topping** ||

C. *Procedural History*

In October 2021, plaintiffs moved to certify a class of produce farmers in order to challenge CHR's freight topping as both a violation of PACA and a breach of fiduciary duty.  ECF No. 89.  (Plaintiffs conceded that their contract claims could not be litigated on a class basis.)  After a hearing on the class-certification motion, the Court determined that certain legal questions need to be answered before the Court could decide whether

to certify one or more classes.  The Court denied the class-certification motion without prejudice and directed the parties to answer the following questions:

>    1.   If the Court finds that defendants violated PACA, may plaintiffs recover damages for that violation without proving they suffered actual harm?
>
>    2.   If the Court finds that defendants breached a fiduciary duty owed to plaintiffs, may plaintiffs recover damages for that breach without proving they suffered actual harm?

ECF No. 142.  The Court answers these questions below.[4]

## II. ANALYSIS

### A. PACA

Plaintiffs allege that CHR violated PACA by failing to disclose its freight topping to plaintiffs when it accounted for the sales of produce it made on plaintiffs' behalf.  For purposes of this order, the Court assumes that is true—i.e., the Court assumes that CHR violated PACA by failing to disclose the freight markups.  The question that remains is: what must plaintiffs prove in order to recover for such a PACA violation?

#### 1. Statutory Framework

PACA was enacted "to provide a practical remedy to small farmers and growers who were vulnerable to the sharp practices of financially irresponsible and

---

[4]The Court also asked the parties to explain how plaintiffs' damages would be calculated if they did not have to prove actual harm.  ECF No. 142.  That question is partially answered in this order; the Court will need a more complete record and additional briefing before it can fully answer that question.

unscrupulous brokers in perishable commodities." *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 780 (8th Cir. 1991) (quoting *Chidsey v. Guerin*, 443 F.2d 584, 587 (6th Cir. 1971)). In relevant part, the statute prohibits commission merchants such as CHR[5] from "fail[ing] or refus[ing] truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had." 7 U.S.C. § 499b(4). The federal regulations interpreting PACA build upon the statutory text as follows:

> When rendering account sales for produce handled for or on behalf of another, an accurate and itemized report of sales and expenses charged against the shipment shall be made. It is a violation of section 2 of the Act to fail to render true and correct accountings in connection with consignments or produce handled on joint account. Charges which cannot be supported by proper evidence in the records of the commission merchant or joint account partner shall not be deducted.

7 C.F.R. § 46.29(a).

### 2. Liability and Damages

According to plaintiffs, CHR violated the statute because it did not "truly and correctly . . . account" for its freight markups. 7 U.S.C. § 499b(4). Plaintiffs concede they do not have a viable claim under PACA unless they can prove, as a practical matter, that plaintiffs bore the economic impact of CHR's freight markups, even though

---

[5] For purposes of this order, the Court assumes that CHR is a "commission merchant" as that term is defined by PACA.

those markups were formally paid by customers. If plaintiffs did *not* bear the impact of the freight markups, then the markups were not "charged against the shipment" for purposes of 7 C.F.R. § 46.29(a), and the regulation did not require CHR to disclose them. Moreover, if plaintiffs did not bear the impact of the freight markups, then plaintiffs were not harmed by those markups, and they do not have standing to challenge their legality. *Cf. Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1379 (8th Cir. 1997) (describing typical rule that, in order to establish standing, litigant must prove injury to himself and concluding that "indirect economic injury" may satisfy this injury requirement).

If plaintiffs *did* bear the impact of the freight markups—and if CHR violated 7 C.F.R. § 46.29(a) by failing to disclose those markups—then the regulation sets forth two potential remedies:

1. The return of any freight markups that CHR cannot support with "proper evidence" in its records, *id.* ("Charges which cannot be supported by proper evidence in the records of the commission merchant . . . shall not be deducted."); and

2. The amount of any actual damages plaintiffs sustained because of CHR's failure to disclose the freight markups to plaintiffs at the time it accounted

for the transactions,[6] *id.* ("The commission merchant . . . may be held liable for any financial loss . . . due to his . . . failure to perform any specification or duty . . . arising out of any transaction subject to the Act."); *see also* 7 U.S.C. § 499e(a) ("If any commission merchant . . . violates any provision of section 499b of this title he shall be liable to the person or persons injured thereby for the full amount of damages . . . sustained in consequence of such violation.").

Plaintiffs have been clear that they are seeking only the first of these potential remedies—i.e, the return of the undisclosed freight markups.  To show that CHR *violated* PACA, plaintiffs must show that, *at the time of the original transactions*, CHR failed to "truly and correctly. . . account" for the freight markups.  7 U.S.C. § 499b(4).  If plaintiffs do so, then they will be entitled to recover the amount of those undisclosed markups unless CHR can *now* show that the markups are "supported by proper evidence in [its] records."  7 C.F.R. § 46.29(a).

In sum, based on the plain language of PACA and its implementing regulations, and based on the concessions made by plaintiffs at oral argument, the Court finds that, if plaintiffs prove that they bore the economic impact of the freight markups, they may

---

[6] In order to prove actual damages, plaintiffs might show, for example, that had CHR's freight topping been disclosed, plaintiffs would have made different arrangements to sell their produce and ultimately earned more in sales returns.

-10-

recover the amount of those markups (1) if plaintiffs prove that CHR failed to "render true and correct accountings" of the markups to plaintiffs and (2) if CHR is unable in this litigation to prove that the markups are "supported by proper evidence in [its] records." *Id.* And thus, plaintiffs do not need to prove that they suffered actual harm as a consequence of CHR's failure to disclose the markups.

### B. Breach of Fiduciary Duty

In addition to their PACA claim, plaintiffs allege that CHR breached a fiduciary duty by engaging in self-dealing. Plaintiffs argue that after CHR negotiated a purchase price for their produce with a buyer and paid someone to transport the produce, CHR had complete discretion to decide how much of the remainder of the purchase price to allot to itself as a freight markup and how much to allot to the grower as payment for the produce. CHR got to keep 100% of each dollar that it allocated to itself, but only 8 to 10% of each dollar that it allocated to growers (the amount of its commission). In putting itself in such a hopelessly conflicted position—and in not even *disclosing* that position to the growers—CHR breached fiduciary obligations. At least that is plaintiffs' claim.

For purposes of this order, the Court assumes that CHR breached fiduciary duties that it owed to plaintiffs. The question is: what must plaintiffs prove in order to recover for CHR's breach?

Everyone agrees that plaintiffs may recover damages for any actual harm they suffered on account of CHR's breach. But plaintiffs have been clear that they are not seeking to recover such damages—no doubt because such damages are likely to be small and because proving such damages would have to be done on a contract-by-contract basis (and thus not be amenable to class treatment).

Instead, plaintiffs are seeking to recover two other categories of damages: (1) the return of the commissions paid to CHR and (2) the return of the freight markups taken by CHR. According to plaintiffs, if they establish a breach of fiduciary duty, then CHR—the faithless fiduciary—must forfeit all of the compensation it received, regardless of whether plaintiffs can show that they were harmed by the breach. In support of their position, plaintiffs rely on the Minnesota Supreme Court's decisions in the *Perl* cases—*Rice v. Perl*, 320 N.W.2d 407 (Minn. 1982) ("*Perl I*"), *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209 (Minn. 1984) ("*Perl II*"), and *Gilchrist v. Perl*, 387 N.W.2d 412 (Minn. 1986) ("*Perl III*").

The *Perl* cases involved an attorney who breached fiduciary duties to his clients by failing to disclose that he had engaged in separate business dealings with the insurance agent with whom he negotiated the settlements of his clients' lawsuits. There was no evidence that any client suffered harm as a result of the attorney's undisclosed conflict of interests. In *Perl I,* the court held that the clients were entitled to forfeiture of

-12-

the attorney's fees, regardless of whether they suffered actual injury and regardless of whether the attorney committed intentional fraud. "This court has repeatedly stated that an attorney (or any fiduciary) who breaches his duty to his client forfeits his right to compensation. . . . 'These consequences follow even though the principal, ignorant of the duplicitous agency, cannot prove actual injury to himself or that the agent committed an intentional fraud.'" 320 N.W.2d at 411 (alteration omitted) (quoting *Anderson v. Anderson*, 197 N.W.2d 720, 724 (Minn. 1972)).

In *Perl II*, the court held that the forfeiture of the attorney's fees was "money damages" within the meaning of a liability-insurance policy because, like nominal damages, forfeiture damages vindicate clients' "absolute right" to their attorney's undivided loyalty. 345 N.W.2d at 212. The court went on to say that even though forfeiture damages are similar to punitive damages in some respects (including a shared purpose of punishing the attorney and deterring similar conduct), forfeiture damages were not "punitive damages" within the meaning of the insurance policy. *Id.* at 214.

Finally, in *Perl III*, the court held that where "no actual fraud or bad faith is involved, [and] when no actual harm to the client is sustained," the client is not automatically entitled the forfeiture of *all* of the fees paid to the attorney. *Id.* at 417. Instead, a court should determine what portion of the fee should be forfeited after

considering "the relevant factors set out in Minn. Stat. § 549.20, subd. 3" (the punitive-damages statute).  *Id.*

In sum, if the holdings of the *Perl* cases apply outside of the attorney-client context—such as to CHR's alleged breach of its fiduciary duties to the growers—plaintiffs would be entitled to some or all of the commissions they paid to CHR, and may be entitled to some or all of the freight markups CHR charged on its sales of plaintiffs' produce.  Plaintiffs would not have to prove actual harm or intentional fraud in order to recover these amounts.

CHR argues that the *Perl* cases should not be applied outside of the attorney-client context.  The Minnesota Supreme Court has never addressed (save in dicta) whether the *Perl* cases apply to other fiduciary relationships, so "this Court must attempt to predict 'what that court would probably hold were it to decide the issue[s].'" *Minnesota Voters All. v. Walz*, 492 F. Supp. 3d 822, 834 (D. Minn. 2020) (quoting *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 729 (8th Cir. 1995)).  For a number of reasons, this Court predicts that the Minnesota Supreme Court would hold that fee forfeiture is available as a remedy in all breach-of-fiduciary cases—including this one—regardless of whether the principal or client proves actual harm or intentional fraud:

*First*, the language used by the Minnesota Supreme Court in *Perl I* is very broad and suggests that its holding applies outside of the attorney-client context.  As noted,

the court held that "an attorney (*or any fiduciary*) who breaches his duty to his client forfeits his right to compensation. . . . [T]he law has traditionally been unyielding in its assessment of penalties when a *fiduciary*, or *trustee*, or *agent* has breached any of his obligations." 320 N.W.2d at 411 (emphasis added).

*Second*, the expectations of a fiduciary are the same, regardless of who the fiduciary is or how he or she came to act in a fiduciary capacity. "The underlying policy is a strong one. . . . [A]bsolute fidelity to the principal's (or beneficiary's) interests is fundamental to establishing the trust necessary to the proper functioning of these relationships." *Id.*; *see also Kaye v. Rosefielde*, 121 A.3d 862, 873 (N.J. 2015) ("The disgorgement remedy is consonant with the purpose of a breach of the duty of loyalty claim: to secure the loyalty that the employer is entitled to expect when he or she hires and compensates an employee."); *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999) ("[A]s a rule a person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust. . . . [A] person who agrees to perform compensable services in a relationship of trust and violates that relationship breaches the agreement, express or implied, on which the right to compensation is based.").

*Third*, the Minnesota Supreme Court has never limited *Perl* to the attorney-client context, and both this Court and the Minnesota Court of Appeals have ordered fee

forfeiture outside of that context. Relying on *Perl*, the Minnesota Court of Appeals held that an insurance broker that had breached a fiduciary duty to its client was required to forfeit its fees, even though its client suffered no actual harm from the breach. *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 780 (Minn. Ct. App. 2006) ("Appellant further argues that because the jury found that respondent suffered no actual harm, appellant should not be required to forfeit any fees or commission. We disagree. Because it is undisputed that appellant breached its fiduciary duty to respondent, appellant forfeited its right to compensation."). And this Court required a trustee to forfeit his fees after he breached fiduciary duties owed to several charitable trusts. *In re Kiernat*, 338 B.R. 809, 815 (D. Minn. 2006) ("Minnesota law is clear that the penalty for the breach of fiduciary duty is the loss of the right to any compensation based on that duty.").

*Fourth*, Minnesota courts are not alone in requiring non-attorney fiduciaries to forfeit their fees when they breach fiduciary duties. *See, e.g.*, *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 870 (Tex. 2010) ("[W]hen a partner in a business breached his fiduciary duty by fraudulently inducing another partner to buy out his interest, the consideration received by the breaching party for his interest in the business is subject to forfeiture as a remedy for the breach."); *Burrow*, 997 S.W.2d at 238 ("To limit forfeiture of compensation to instances in which the principal sustains actual damages

would conflict with both justifications for the rule. It is the agent's disloyalty, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation.");[7] *Kaye*, 121 A.3d at 864–65 ("[W]e hold that the remedy of equitable disgorgement is available to a trial court even absent a finding that the employer sustained economic loss by virtue of the employee's disloyal conduct."); *Langston v. Hoyt*, 194 P. 654, 656–57 (Kan. 1921) ("If the fraud is that of the broker, his contract with the principal is avoided, whether or not it resulted to the injury of the principal, and this rests on questions of public policy rather than of injury to the principal."); *Lawrence Fed. Sav. v. Bittenbender*, No. 67,134, 1993 WL 13965319, at *4 (Kan. Ct. App. Mar. 19, 1993) (relying on *Langston* to hold that "a faithless agent forfeits his commission even if his principal has suffered no harm" in real-estate-agent context).

In sum, nothing in law or logic limits the principles embraced by the *Perl* cases to the attorney-client relationship. Rather, those principles apply with equal force when a non-attorney breaches a fiduciary duty, as CHR allegedly did in this case. If CHR breached a fiduciary obligation to plaintiffs, then CHR must forfeit at least a part[8] of the

---

[7]Although *Burrow* involved an attorney-client relationship, the Texas Supreme Court crafted its fee-forfeiture ruling in reliance on its earlier opinion in *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942), which involved an employer-employee relationship.

[8]Whether plaintiffs are entitled to total or partial forfeiture will be determined by applying the factors identified in *Perl III*. 387 N.W.2d at 417.

commissions that it charged and at least a part of any profit that it earned by adding a markup to the freight charges.[9] And CHR must do so even if plaintiffs cannot show that they suffered harm as a result of CHR's breach.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, the parties' motions for partial summary judgment [ECF Nos. 157, 163] are GRANTED IN PART and DENIED IN PART, to the extent consistent with this order.

Dated: March 1, 2023                s/Patrick J. Schiltz
                                    Patrick J. Schiltz, Chief Judge
                                    United States District Court

---

[9] This assumes, of course, that the economic impact of the freight markup was borne by the growers, and not the buyers. If the buyers paid the markup not only in form but in substance, then the markup represented profit that CHR earned from its (non-fiduciary) relationship with the buyers rather than from its (fiduciary) relationship with the growers. *Cf. Commercial Assocs.*, 712 N.W.2d at 781 (declining to require forfeiture of commissions paid by a third-party where "there was no evidence that respondent . . . bore the 'economic burden' of the insurance commissions").