UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JMR FARMS, INC.; MELON ACRES, INC.;
CENTRAL FLORIDA FRUIT SALES, LLC,
d/b/a Sanway Farms, Inc.; KEVIN
COGGINS, d/b/a MEK Farms; HOOSIER
MELONS, LLC; SHORE SWEET
GROWERS, LLC; BONNE IDEE
PRODUCE, LLC; BOWLES FARMING
COMPANY, INC.; WAINWRIGHT
BROTHERS FARMS, LLC; GLORY
PRODUCE INC.; and SK ENTERPRISES OF
NORTH FLORIDA, INC., individually and
on behalf of all others similarly situated,

Case No. 20-CV-0879 (PJS/ECW)

ORDER

        Plaintiffs,

v.

C.H. ROBINSON WORLDWIDE, INC.;
C.H. ROBINSON COMPANY, INC.; and
C.H. ROBINSON COMPANY,

        Defendants.

---

Francisco Guerra IV, Jennifer A. Neal, Alexis Renae Garcia, Michael
Montano, and Mark Anthony John Fassold, GUERRA LLP; Richard M.
Paul III, Laura Fellows, and Ashlea Schwarz, PAUL LLP; Robert Andrew
Pollom, KRW LAWYERS; Craig A. Stokes, STOKES LAW OFFICE LLP;
and Sean R. Cooper, KRIGEL NUGENT MOORE, P.C., for plaintiffs.

Mark William Wallin, Christina M. Janice, and Benjamin S. Perry,
BARNES & THORNBURG, LLP; and Bradley Richard Hutter and Patrick
J. Rooney, FAFINSKI MARK & JOHNSON, P.A., for defendants.

Plaintiffs ("Growers") brought this action against defendants C.H. Robinson Worldwide, Inc., C.H. Robinson Company, Inc., and C.H. Robinson Company (collectively, "CHR"), alleging violations of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a et seq., and breaches of fiduciary duty.[1]  This matter is before the Court on CHR's motion for summary judgment.  For the reasons that follow, the Court grants CHR's motion with respect to Growers' PACA claim but denies the motion with respect to Growers' breach-of-fiduciary-duty claim.

## I.  BACKGROUND

Growers are produce farmers who contracted with CHR (a logistics company) to market and sell their produce to grocery stores, restaurants, wholesalers, and other CHR customers.  Wallin Decl. Ex. 2 at 3, ECF No. 231.  Within CHR, the Robinson Fresh ("RF") business division markets and sells Growers' produce to buyers.  *Id.*  RF tracks the daily produce market and determines the price of produce ("FOB price") to quote to potential buyers.  Vosejpka Decl. ¶¶ 5–12, ECF No. 231-3.  For each sale, CHR earns a commission calculated as a percentage of the FOB price, typically around 10%.  *See* Guerra Decl. Exs. 35–45, ECF Nos. 237–38.  After deducting the commission and any

---

[1]Growers have abandoned their claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Pls.' Br. at 1 n.1, ECF No. 233.  Accordingly, those claims are dismissed with prejudice.  Likewise, the parties agree—and the Court orders—that Central Florida Fruit Sales, LLC should be dismissed from the lawsuit and replaced with Sandway Farms, Inc.  Hrg. Tr. 42:16–43:8, 50:2–6, ECF No. 245.

advances and expenses that CHR paid on the grower's behalf, CHR remits the remainder of the FOB price to the grower. *See, e.g.*, Guerra Decl. Ex. 39 § 5(h)(iii).

In "delivered-sale transactions," CHR also arranges the transportation of the produce from the grower to the buyer. Vosejpka Decl. ¶¶ 18–19. When a buyer requests a delivered-sale transaction, the RF sales representative contacts North American Surface Transportation ("NAST")—a separate CHR business division—to get a quote for the cost of transporting the produce from the grower to the buyer. *Id.* ¶ 19. NAST's freight estimate includes a markup for its services. Baumann Dep. 50:15–51:2, ECF No. 231-4. In other words, NAST's freight quote includes a margin for profit on top of the cost of paying a third party to transport the freight. *Id.* These freight markups are the subject of this lawsuit.

According to Growers, the freight markups constituted additional, undisclosed fees over and above the agreed-upon sales commissions. Growers allege that CHR quoted a single delivered-sale price to a buyer, and then, after the buyer accepted the quote, CHR decided how to allocate the sales proceeds between the freight charge and the FOB price. *Id.*; Vosejpka Decl. ¶ 20; Guerra Decl. Ex. 3, ECF No. 234. The more CHR allocated to freight, the less the grower received for its produce. After CHR paid itself for the freight costs (including the markup), CHR would remit—and report—only what remained of the total sales proceeds to the grower as the FOB price. Baumann

Decl. ¶ 6, ECF No. 231-8. Growers refer to this practice as "freight topping," because CHR "tops" the actual cost of freight by adding a markup.

According to CHR, there was no ex post facto allocation of the sales price between freight costs and FOB price. Instead, the FOB price and the freight costs were set independently—the former by the RF division, and the latter by the NAST division. Vosejpka Decl. ¶¶ 19–20; Baumann Dep. 58:7–15. Indeed, depending on the buyer, the FOB price and freight costs were often quoted—and negotiated—separately rather than as a single lump sum. Vosejpka Decl. ¶ 20.

CHR also claims that only *after* the buyer agrees to the final delivered-sale price does NAST attempt to secure freight services and discover what transporting the produce will actually cost. *Id.* ¶ 21. If NAST quoted a higher cost of freight than what the freight ends up actually costing, then CHR (through NAST) pockets the profit. Baumann Dep. 50:24–51:2. Conversely, if NAST quoted a lower cost of freight than what the freight ends up actually costing, then CHR (through NAST) eats the loss. *Id.* In either case, CHR says, the freight cost does not affect the FOB price because the freight is separately paid for by the buyer and CHR—not the grower—and therefore the freight cost does not need to be disclosed. *Id.* at 51:10–12.

In October 2021, Growers moved to certify a class of produce farmers in order to challenge CHR's freight topping as both a violation of PACA and a breach of fiduciary

duty.  ECF No. 89.  The Court denied the motion without prejudice after determining

that certain legal questions needed to be answered before the class-certification motion

could be decided.  The Court ordered both parties to move for partial summary

judgment on those legal questions.  ECF Nos. 136–37.  In resolving those summary-

judgment motions, the Court determined that to prevail on both the PACA and

fiduciary-duty claims, Growers needed to show that Growers, rather than buyers, bore

the "economic impact" of the freight topping.  ECF No. 189.

In September 2024, the Court denied Growers' second motion for class

certification after determining that the question of who bore the economic impact of

freight topping required a transaction-by-transaction analysis.  ECF No. 226.

## II. ANALYSIS

### A.  *Standard of Review*

Summary judgment is warranted when the evidence in the record shows that

"there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it affects the

outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  A dispute of material fact is "genuine" if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When a

party moves for summary judgment, the nonmoving party "must set forth specific facts

showing that there is a genuine issue for trial." *Id.* at 250 (citation omitted). If a "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## B. PACA

Growers allege that CHR violated PACA by failing to "truly and correctly . . . account" to Growers for its freight markups. 7 U.S.C. § 499b(4); *see also* 7 C.F.R. § 46.29(a) ("When rendering account sales for produce handled for or on behalf of another, an accurate and itemized report of sales and expenses charged against the shipment shall be made."). In its previous summary-judgment order, the Court held that, for Growers to recover on their PACA claims, they must first "prove that they bore the economic impact of the freight markups," because without such an impact, there was no "charge[] against the shipment" to be disclosed. S.J. Order at 10, ECF No. 189. Further, in its order denying class certification on Growers' PACA claims, the Court concluded "that the factors that bear on the issue of who bore the economic impact of the freight markup will vary materially from transaction to transaction" and that a factfinder would have to examine "all of the relevant factors with respect to each relevant transaction." Class Cert. Order at 9, ECF No. 226. Thus, to show a violation of

PACA, Growers must prove that they bore the economic impact of the freight markup for each challenged transaction.

Growers' only evidence of economic impact is an expert report—prepared for purposes of class certification—that opines on the economic impact of the freight markups using the aggregated data of 212 putative class members (not just the named plaintiffs). Pls.' Br. at 20–22. That report states that "there is a negative formulaic relationship between CHR's freight profits and Growers' revenue" and that, on average, "FOB prices [are] lower when freight charges and freight profits are higher." Markosyan Decl. Ex. 2 ¶¶ 20, 86, ECF No. 239. Although the expert examined all (available) transactions in forming his opinion on the aggregate economic impact of freight topping, the expert did not opine as to the economic impact of freight topping on any particular transaction. Hrg. Tr. 33:15–22, 36:2–21. The report is therefore insufficient to establish that a grower bore the economic impact of a freight markup with respect to a particular transaction.

Growers have no other evidence establishing that a grower bore the economic impact of a freight markup in connection with a particular transaction. Thus, Growers cannot show that CHR violated PACA by failing to account for a "charge[] against [a] shipment" in the form of a freight markup. The PACA claims are dismissed.

### C.  Breach of Fiduciary Duty

CHR moves for summary judgment on Growers' fiduciary-duty claim on the grounds that no fiduciary relationship existed between the parties, and that, even if CHR did owe fiduciary duties to Growers, Growers cannot show that they bore the economic impact of any breach of those duties.

### 1.  Existence of Duties

Growers argue that CHR owed them fiduciary duties as their agents in the consignment sale of their produce.  *See* Restatement (Second) Agency § 13 (1958) ("An agent is a fiduciary with respect to matters within the scope of his agency.").  Growers primarily rely on *Jurek v. Thompson* to argue that CHR was their agent with respect to the delivered-sale transactions.  241 N.W.2d 788 (Minn. 1976).  In *Jurek*, the Minnesota Supreme Court addressed whether a "sale on consignment" evidenced a (non-fiduciary) buyer-seller relationship or instead a (fiduciary) agent-principal relationship.  *Id.* at 792 n.6 (quoting Restatement (Second) of Agency § 14J cmt. b).  In this case, that question turns on whether CHR's "duty is to act primarily for the benefit of the [Growers] or is to act primarily for [its] own benefit."  *Id.* (quoting Restatement (Second) of Agency § 14J).

The *Jurek* court adopted a seven-factor test to determine whether such consignment sales involve fiduciary or non-fiduciary relationships.  *Jurek*, 241 N.W.2d

at 792 n.6.  Answered affirmatively, the following factors tend to indicate that the sale is

a non-fiduciary (buyer-seller) relationship rather than a fiduciary (agent-principal)

relationship:  (1) "the consignee gets legal title and possession of the goods;" (2) "the

consignee becomes responsible for an agreed price, either at once or when the goods are

sold;" (3) "the consignee can fix the price at which he sells without accounting to the

transferor for the difference between what he obtains and the price he pays;" (4) "the

goods are incomplete or unfinished and it is understood that the transferee is to make

additions to them or to complete the process of manufacture;" (5) "the risk of loss by

accident is upon the transferee;" (6) "the transferee deals, or has a right to deal, with the

goods of persons other than the transferor;" and (7) "the transferee deals in his own

name and does not disclose that the goods are those of another."  *Id.* (quoting

Restatement (Second) of Agency § 14J cmt. b).

Here, the first five factors clearly favor a finding of a fiduciary relationship:

First, CHR did not get legal title to, or possession of, the produce at any point

during the transaction.  To the contrary, Growers expressly retained title to the produce

until it was accepted by CHR's arranged buyer.  *See, e.g.*, Guerra Decl. Ex. 39 § 4(g).

Curiously, CHR argues that the transactions were not consignment sales—and therefore

that CHR was not an agent—because CHR never took physical possession of the

produce.  Defs.' Br. at 29 n.10, ECF No. 230; Defs.' Reply at 14, ECF No. 241.  The

argument is odd for a number of reasons, not least of which is that CHR's contracts expressly state that CHR will market and sell the produce "*on a consignment basis*." *See, e.g.*, Guerra Decl. Ex. 39 § 5(a) (emphasis added). Further, the *Jurek* court explicitly designates possession *by a consignee* in a consignment sale as evidence of a buyer-seller relationship, and consequently a *lack* of possession *by a consignee* in a consignment sale as evidence of an agency relationship. *Jurek*, 241 N.W.2d at 792 n.6 (quoting Restatement (Second) of Agency § 14J cmt. b(1)). Indeed, *Jurek* suggests that consignment sales in which a consignee directs the consignor to "deliver the goods directly to the ultimate purchaser"—such as in the delivered-sale transactions at issue in this case—are much more common when there *is* an agent-principal relationship between consignee and consignor. *Id.* Clearly then, physical possession of the goods by the consignee is not a necessary component of a consignment sale—or an agency relationship—under Minnesota law. The first factor therefore militates in favor of CHR's role being that of a fiduciary.

Second, CHR was not responsible to Growers for any set price. CHR agreed to "endeavor to obtain the best prices" for the produce,[2] but disclaimed any obligation to achieve any specific—or even positive—return for Growers. Guerra Decl. Ex. 39 § 5(b).

---

[2]Some contracts use different language—such as obtaining a "commercially reasonable" price for the produce, *see* Guerra Decl. Ex. 41 § 2.04—but each contract expresses the same intention that CHR will work to get the highest possible price for the growers.

Moreover, as CHR emphasizes, CHR was granted full control of the prices at which to sell Growers' produce. *Id.* § 5(c), (f). Thus, CHR was responsible for negotiating the FOB price on Growers' behalf, and if CHR negotiated poorly, Growers could receive a negative return on their produce. Because of the trust and discretion Growers placed in CHR to secure the "best" price for their produce, the second factor strongly favors CHR's role as a fiduciary.

Third, CHR was required to account to Growers for the FOB price at which it sold the produce and remit the proceeds, less its commission and expenses. *Id.* § 5(h)(iii). As discussed, because the Growers did not agree to sell at a fixed price, CHR could not sell the produce at a markup and pocket the difference, as a reseller might. CHR's only (contractually authorized) compensation from the transaction was in the form of a commission based on a percentage of the FOB price. *Id.* § 3. The third factor therefore indicates a fiduciary relationship.

Fourth, the produce was completed and delivered directly from the growers to the buyers without any improvements or additions by CHR. Again, CHR never took physical possession of the produce, but instead arranged for third parties to deliver the produce directly to the buyer from the grower's farm. Thus, the fourth factor also indicates that CHR's role was as a fiduciary.

-11-

Fifth, Growers—not CHR—bore the risk of loss by accident. *Id.* § 4(g). In fact, Growers bore not only the risk of loss by accident, but "all quality risks associated with all PRODUCTS until delivery to and acceptance by C.H. ROBINSON'S customers." *Id.* Because Growers bore the risk of spoilage before acceptance by the buyer—a fact that is hard to square with a buyer-seller relationship between CHR and Growers— the fifth factor also points to a fiduciary relationship.

The sixth and seventh factors point the opposite way—to a buyer-seller relationship. Although growers made CHR their "exclusive" sales representative for their produce, *id.* § 3, there was no reciprocal promise on CHR's part. CHR was free to, and did in fact, deal with other growers, as evidenced by the number of plaintiffs in this case. This sixth factor carries little weight, however, given that many fiduciaries (such as attorneys) owe duties to many principals. The fact that a consignee would have multiple principals is unsurprising as it is essentially the business model of most consignees. *See, e.g., In re Mandell, Spector, Rudolph Co.,* 24 A.D. 651, 656–91 (U.S.D.A. 1965) (describing company acting as consignee-agent in produce transactions with multiple growers simultaneously); *In re Produce Distribs., Inc.,* 58 A.D. 506, 1999 WL 46537, at *7–10 (U.S.D.A. 1999) (same).

Finally, CHR sold the produce under its own "Robinson Fresh" brand, and there is no evidence that CHR disclosed to its customers that the produce was actually

Growers'. Again, the Court finds this factor to be less important, as this is a common

business model of companies like CHR. *See* Defs.' Br. at 28 n.8. Thus, the last two

factors favor a buyer-seller relationship, but not strongly.

In sum, the *Jurek* factors overwhelmingly support a finding that the relationship

between CHR and Growers was a fiduciary relationship between agent and principal.

CHR all but concedes that the *Jurek* factors dictate that it owed Growers fiduciary duties

in connection with the sale of their produce. Nevertheless, CHR insists that there was

no agency because Growers did not *control* CHR, making CHR more like an

independent contractor than an agent. In support of its argument, CHR points to

language in the contracts that grants CHR "full control of the times when, the places

where, the parties to whom, the methods and prices for which the PRODUCTS are sold,

and the authority to sell to customers on an FOB, Delivered, Re-consignment, Open, or

Price-After-Sale." Guerra Decl. Ex. 39 § 5(c); *see also id.* § 5(f) ("For the avoidance of

doubt, GROWER and C.H. ROBINSON expressly agree that C.H. ROBINSON, in

accordance with this Section 5, is empowered to and will make the final determination

regarding sales price of the PRODUCTS to the third party customers.").

CHR is correct that "there must be at least some element of control" to establish

an agency relationship, but a "strict right of [p]hysical control is not necessary." *See*

*Jurek*, 241 N.W.2d at 791–92. "The right of control by the principal may be exercised by

-13-

prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times."  Restatement (Second) Agency § 14 cmt. a; *see also Jurek*, 241 N.W.2d at 791–92 (citing Restatement (Second) Agency § 14).  Control, therefore, may be established by a contract imposing preconditions to an agent's authorized actions.  *See* Restatement (Second) Agency § 14 cmt. a; *see also Finn v. Walworth State Bank*, 2013 WL 6389521, at *12 (Minn. Ct. App. 2013) (reasoning that principal exercised control over agent through the terms of an agreement) (unpublished); *Adams v. Harpstead*, 947 N.W.2d 838, 846 (Minn. Ct. App. 2020) (holding that, although not precedential, unpublished opinions of the court of appeals may be cited for their persuasive and instructive value).  Further, a right to control may exist "even though the principal agreed that he would not exercise it."  Restatement (Second) Agency § 14 cmt. a.

Growers plainly had the right to control CHR, and they exercised that control. True, Growers granted CHR discretion to determine the details of the produce sales (including the price), but CHR was confined in its exercise of that discretion by certain preconditions, including CHR's obligation to market the produce and strive to get the best possible price.  Moreover, Growers (who at all times possessed and held title to the produce) could have revoked CHR's authority to sell the produce on their behalf, even though it would have constituted a breach of contract.  *Id.* ("[T]he agent is subject to a

duty not to act contrary to the principal's directions, although the principal has agreed

not to give such directions.  Further, the principal has power to revoke the agent's

authority, *although this would constitute a breach of his contract with him*." (cleaned up)

(emphasis added)).  If anything, the discretion that CHR exercised under the contracts

only emphasizes the obvious: an agent who assumes the authority—especially the

*exclusive* authority—to market and sell perishable crops on behalf of its principal has the

duty to act with the utmost loyalty and care.  *See, e.g., Holzer v. Tonka Bay Yachts &*

*Marine Sales, Inc.*, 386 N.W.2d 285, 287 (Minn. Ct. App. 1986) ("A consignee, also known

as a factor, is bound to exercise the utmost good faith and loyalty to his principal, the

consignor.").

      For these reasons, the Court concludes that CHR was Growers' agent with

respect to the delivered-sale transactions and therefore owed fiduciary duties to

Growers, including the "duty to disclose any material matter bearing upon the [agent's]

duty to represent the [principal] with undivided loyalty."  *Rice v. Perl*, 320 N.W.2d 407,

410 (Minn. 1982) [*hereinafter Perl I*]; S.J. Order at 14–17 (reasoning that the Minnesota

Supreme Court would apply the *Perl* cases outside of the attorney-client context); *see*

*also Holzer*, 386 N.W.2d at 287–88 ("A consignee must . . . provide his principal with all

necessary and useful information relating to the consignment and has a duty to account

-15-

to the consignor within a reasonable time or upon a reasonable demand.") (citing

*Farmers Co-operative Elevator Co. v. Enge*, 148 N.W. 465 (Minn. 1914)).

### 2. Breach

Under Minnesota law, CHR clearly breached a fiduciary duty to Growers.

A fiduciary whose undisclosed conduct puts a client at "potential risk" of harm from

the fiduciary's divided loyalties—such as the opportunity for self-dealing—has violated

its fiduciary duty. *Perl I*, 320 N.W.2d at 411. Growers need not show that CHR *actually*

engaged in self-dealing, only that (1) CHR had the *opportunity* to engage in self-dealing

in the sale of Growers' produce and (2) CHR did not disclose that risk to Growers. It is

undisputed that CHR did not disclose the freight markups to Growers. *See* Defs.' Br. at

31.

Even *CHR's* description of the structure of the delivered-sale transactions makes

clear the risk that CHR could engage in self-dealing. CHR contends that freight costs

and FOB price were quoted independently by two separate divisions within CHR and

that those prices were not later adjusted to maximize CHR's profit. In essence, then,

CHR concedes that at the same time that it was negotiating FOB prices for the Growers,

it was also negotiating freight charges and markups for itself. Under such

circumstances, CHR had a perverse incentive to accept a discounted FOB price (for

which it received only a percentage as commission) in exchange for higher freight charges and markups (the profits of which accrued entirely to CHR).

Moreover, the consequence of a low FOB price would be a lower commission for CHR, but CHR would still earn money. By contrast, the consequence of a low freight price could be a *loss* to CHR. Thus, the risk of loss and the greater potential for profit both provided strong incentives for CHR to prioritize higher freight costs and markups at the expense of FOB prices. In short, CHR placed itself in the position of potentially choosing between its own profits and the profits of the Growers to whom it owed fiduciary duties.

In Growers' telling, the potential for self-dealing was even more obvious. Growers contend that CHR quoted and negotiated a single all-in sales price to buyers and then internally allocated the final sale price between FOB price and freight costs. In making such allocations, CHR's clear incentive would be to prioritize freight costs and markups to maximize its own profit. Thus, it does not matter whether CHR's description or Growers' description is more accurate. In either case, CHR placed itself in the position of having divided loyalties.[3]

---

[3]Of course, CHR could have avoided any breach by simply *disclosing* its profits on freight to Growers, which disclosure would have allowed Growers to decide for themselves whether to continue to engage in delivered-sale transactions or whether to choose a different sales agent. *See Perl I*, 320 N.W.2d at 411. If the practice is as common and as widely known as CHR represents, then disclosure should not have

(continued...)

Not only did CHR place itself in the position of having divided loyalties, but Growers have submitted evidence that those divided loyalties did in fact affect the outcomes of delivered-sale transactions. *See* Markosyan Decl. Ex. 2 ¶¶ 20, 86 (stating "there is a negative formulaic relationship between CHR's freight profits and Growers' revenue" and "FOB prices [are] lower when freight charges and freight profits are higher"). Regardless, by failing to disclose information material to CHR's performance of its obligations with respect to the delivered-sale transactions, CHR breached its fiduciary duty to Growers.

### 3. Damages

CHR argues that Growers cannot show that they bore the economic impact of the freight markups. In previous orders, the Court adopted the view that Growers must show economic impact in order to recover for breach of fiduciary duty. *See, e.g.*, Class Cert. Order at 5. Upon further review, however, the Court concludes that it was mistaken, at least in one respect.[4]

---

[3](...continued)
harmed CHR's business.

[4]CHR argues that the law-of-the-case doctrine binds this Court to its previous rulings. That is plainly not true. The law-of-the-case doctrine "applies only to issues decided by final judgments." *Borchardt v. State Farm Fire & Cas. Co.*, 325 F. Supp. 3d 953, 957 (D. Minn. 2018) (quoting *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992)). A court is free to reconsider its previous rulings at any time prior to the entry of judgment. *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 620 (8th Cir.

(continued...)

Under the *Perl* line of cases, a fiduciary that breaches its duty forfeits the right to compensation from the principal—period. *Perl I*, 320 N.W.2d at 411. The breach need not cause actual harm to warrant forfeiture. *Id.* Because the right to loyalty is an "absolute right," the principal "is deemed injured even if no actual loss results." *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 212 (Minn. 1984) [*hereinafter Perl II*]. For example, the plaintiff in *Perl I* did not need to prove that she had been defrauded, received bad advice, or been economically impacted by her fiduciary's breach. *Perl I*, 320 N.W.2d at 411. The injury existed "in the client's justifiable perception that he or she has or may have received less than the honest advice and zealous performance" of the fiduciary. *Perl II*, 345 N.W.2d at 213. Thus, the *Perl* cases explicitly rejected the idea that, to recover the compensation paid for the fiduciary's services, a principal must suffer an injury beyond the degradation of the fiduciary relationship.

The purpose of forfeiture is to "make amends to the client" and "put right the [fiduciary] relationship that has been tainted" by the failure to disclose. *Id.* at 214. To that end, "the outer limits of a fee forfeiture cannot exceed the amount of the earned fee." *Id.* (distinguishing punitive damages from fee forfeiture). A wronged principal's

---

[4](...continued)

2007) ("[I]nterlocutory orders . . . can always be reconsidered and modified by a district court prior to entry of a final judgment." (cleaned up)); *see also* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment . . . .").

recovery "is limited to forfeiture of compensation paid by the client and does not extend to commissions paid by a third-party." *Com. Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 781–82 (Minn. Ct. App. 2006).

Thus, whether Growers bore the economic impact of the freight markups is relevant, but only to determining whether the freight markups constitute compensation paid by Growers to CHR. If so, the freight markups would be subject to forfeiture. But as the Court has explained, Growers have no evidence that they bore the economic impact of the freight markups—i.e., that Growers "paid" the costs of the freight markups rather than the third-party buyers or CHR. Because no Grower can establish that it suffered the impact of a freight markup with respect to a delivered-sale transaction, CHR's profits on freight are not recoverable.

The sales commissions are a different story. It is undisputed that CHR's commissions were deducted from the FOB price, directly reducing the amount of money paid to Growers. Without question, then, the commission was a form of compensation paid by Growers to CHR as their sales agent and therefore is subject to forfeiture. That said, "when no actual fraud or bad faith is involved, when no actual harm to the client is sustained, and particularly when there are multiple potential plaintiffs," the fee forfeiture need not be total. *Gilchrist v. Perl*, 387 N.W.2d 412, 417 (Minn. 1986) [*hereinafter Perl III*]. Instead, the amount of the forfeiture must be

determined by considering the relevant statutory factors for measuring punitive damages. *Id.*

Growers have presented no evidence that CHR acted fraudulently or in bad faith or that any actual harm was sustained by any grower, and there are multiple potential plaintiffs. Consequently, the only issue that remains to be resolved is what portion of CHR's sales commissions earned from delivered-sale transactions should be forfeited under the *Perl III* factors.

One final matter: In light of the Court's decision that growers do not need to prove economic impact in order to recover the commissions that they paid to CHR, class treatment of that particular claim may be appropriate. The Court therefore invites plaintiffs to move for a limited reconsideration of the Court's September 9, 2024 order denying their motion for class certification. ECF No. 226.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT defendants' motion for summary judgment [ECF No. 229] is GRANTED IN PART and DENIED IN PART as follows:

1.  Plaintiffs' PACA, contract, and implied-covenant claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

2.  The motion is DENIED in all other respects.

Dated:  August 22, 2025                    /s/ Patrick J. Schiltz
                                           Patrick J. Schiltz, Chief Judge
                                           United States District Court